## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

FRED DEAN CHAVEZ,

      Plaintiffs

vs.                                                                No. CIV 13-0309 JB/LFG

COUNTY OF BERNALILLO, AND
RAMON RUSTIN, CHIEF OF CORRECTIONS
OF METROPOLITAN DETENTION CENTER,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary

Judgment, filed April 11, 2013 (Doc. 8).  The Court held a hearing on July 2, 2013.  The primary

issues are: (i) whether the Defendants violated Plaintiff Fred Dean Chavez' constitutional rights

by incarcerating him pursuant to a bench warrant that had been cancelled before Chavez was

arrested; (ii) whether the Defendants violated Chavez' constitutional rights by continuing to

detain Chavez after Chavez' attorney sent notice that the bench warrant had been cancelled; and

(iii) whether Chavez has established facts sufficient to maintain his municipal liability claim

against the Defendant County of Bernalillo.[1]  The Court concludes that the Defendants did not

violate Chavez' constitutional rights, because they initially detained him pursuant to a facially

valid warrant, and because they acted reasonably in requiring a court order setting Chavez'

conditions of release before releasing him.  Even if there were a constitutional violation, the law

was not clearly established.  Without a constitutional violation, the Court concludes that Chavez

---

[1] The Defendants state that the correct name for "County of Bernalillo" is "The Board of County Commissioners of the County of Bernalillo, New Mexico."  Defendants Answer to Complaint for False Arrest, False Imprisonment and Damages ¶ 8, at 2, filed March 11, 2013 (Doc. 7).

cannot maintain a municipal liability claim.  These conclusions dispose of all federal claims in this case.  The Court will decline to exercising supplemental jurisdiction over the remaining state-law claims and will, therefore, remand the case.

## FACTUAL BACKGROUND

On February 5, 2011, Albuquerque Police Department ("APD") arrested and booked Plaintiff Fred Dean Chavez into the Metropolitan Detention Center ("MDC") on an outstanding warrant.  See Complaint for False Arrest, False Imprisonment and Damages ¶ 3, at 1, filed in state court February 4, 2013, filed in federal court March 2, 2013 (Doc. 2)("Complaint"); Affidavit of Alexis Iverson ¶ 6, at 3, filed March 11, 2013 (Doc. 8-1)("Iverson Aff."); Bench Warrant, filed July 1, 2013 (Doc. 24-1 at 7); Pre-Booking Worksheet, filed July 1, 2013 (Doc. 24-1 at 8); Offender Booking Sheet, filed July 1, 2013 (Doc. 24-1 at 9);[2] MSJ ¶ 1, at 2 (setting forth this fact).[3]  The Docket Sheet for State of New Mexico vs. Chavez Fred Dean, filed

_____

[2] Chavez points out that the Defendants did not attach the correct Bench Warrant, Pre-Booking Worksheet, and Offender Booking Sheet to the MSJ.  See Plaintiff's Response to Defendant's Motion for Summary Judgment ¶ IV.C, at 5, filed June 29, 2013 (Doc. 23)("Response").  The Defendants attached the correct documents in their Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment, filed July 1, 2013 (Doc. 24)("Response"), and the Court cites those corrected documents.

[3] The local rules state:

The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  The local rules regarding summary judgment thus require the responding party to "specifically controvert[]" the movant's fact, or else the fact is deemed undisputed.  D.N.M.LR-Civ. 56.1(b).  Because Chavez did not specifically controvert any of the facts that the Defendants set forth in the MSJ, the Court will deem those facts undisputed.

June 29, 2013 (Doc. 23-1)("State Docket"), indicates that, on January 20, 2011, a bench warrant

was issued for Chavez for a failure to appear at a plea hearing; the entry on the State Docket for

January 28, 2011, states: "ORD: QUASHING WARRANT / ISSUED / FILING STIPULATED

ORDER TO CANCEL BENCH WARRANT ON CHAVEZ."  State Docket at 2.  <u>See</u> Response

at 4 (setting forth this fact).[4]  Judge Flores cancelled the bench warrant on January 28, 2011.  <u>See</u>

Stipulated Order to Cancel Bench Warrant, filed March 11, 2013 (Doc. 8-19 to -20)("Stipulated

Order").

On February 8, 2011, Scott Pistone, Chavez' lawyer, sent a letter by facsimile

transmission to Defendant Ramon Rustin, the MDC Director, requesting that he release Chavez

from custody immediately, because a stipulated cancellation of Chavez' bench warrant had been

entered in Chavez' pending criminal case on January 28, 2011.  <u>See</u> Affidavit of Brandi Urrutia

¶ 4, at 2, filed March 11, 2013 (Doc. 8-16)("Urrutia Aff."); Facsimile Transmission from Scott

Pistone, the Law Offices of Scott Pistone, Ltd. Co., to Ramon Rustin, Chief of Corrections, sent

---

[4] Chavez set forth this fact by citing the Complaint, which states: "The arrest and detention of Plaintiff was without just cause.  The warrant that was the purported basis for the arrest had been cancelled by the Hon. Jacqueline Flores and entered on the public court docket on January 28, 2011 (Case#D-202-CR-2010-04057)."  Complaint ¶ 5, at 2; Response at 4.  The local rules provide that the "Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies."  D.N.M.LR-Civ. 56.1(b).  Chavez did not provide a list of additional facts, but set forth this statement from the Complaint and attached evidence to support it.  The Court will modify the asserted fact consistent with the State Docket.  Further, legal arguments should not be set forth in a party's asserted fact section during summary judgment.  <u>See</u> <u>Ruiz v. City of Brush</u>, No. 05-897, 2006 WL 1816454, at *4 (D. Colo. June 30, 2006)(Nottingham, J.)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute.  Legal argument . . . should be reserved for separate portions of the brief.'" (alterations in original)).  The Court will modify the asserted fact to remove any legal arguments.

February 8, 2011, filed March 11, 2013 (Doc. 8-17 to -18)("Pistone Fax")(enclosing the Stipulated Order")); Affidavit of Ramon Rustin ¶ 1, at 1 (filed March 11, 2013)("Rustin Aff.")(describing Rustin's role at MDC; MSJ ¶ 2, at 2 (setting forth this fact).[5]

Urrutia scanned the facsimile transmission, and sent it to the corrections tech supervisor and acting records supervisor Alexis Iverson on the morning of February 8, 2011 to investigate; Iverson supervised the technical units that handled bookings, releases, and monitoring of court paperwork at the MDC.  See Urrutia Aff. ¶ 5, at 2; Electronic Mail Transmission from Brandi Brinkman-Urrutia to Alexis M. Iverson, sent Feburary 8, 2011 at 10:10 a.m., filed March 11, 2013 (Doc. 8-21)("First Urrutia E-mail"); MSJ ¶ 3, at 2 (setting forth this fact).[6]  Within thirty

_____

[5] The MSJ states that, "[o]n February 8, 2011, Brandi Brinkman-Urrutia, assistant to MDC Director Ramon Rustin, received a fax from a lawyer named Scott Pistone."  MSJ ¶ 2, at 2. The local rules require a movant for summary judgment to "refer with particularity to those portions of the record upon which the movant relies."  D.N.M.LR-Civ. 56.1(b).  The MSJ cites to the Urrutia Aff. and the Pistone Fax; neither provide evidence that Urrutia received the Pistone Fax.  The Urrutia Aff. States: "Based on my review of my files, I located a fax that was submitted to MDC administration on February 8, 2011 by a lawyer named Scott Pistone." Urrutia Aff. ¶ 4, at 2.  Because the portions of the record to which the Defendants refer do not support the Defendants' asserted fact, the Court will modify the asserted fact in a manner consistent with the Urrutia Aff. and Pistone Fax.

[6] The local rules require a movant for summary judgment to "refer with particularity to those portions of the record upon which the movant relies."  D.N.M.LR-Civ. 56.1(b).  The MSJ cites to the Urrutia Aff. and the First Urrutia E-mail; neither provide evidence of Iverson's job duties.  The Urrutia Aff. states: "Ms. Iverson was both the acting records supervisor and a corrections tech supervisor at that time.  As such, she would have been the best person to inquire into the matter based on her knowledge and expertise in overseeing records and processing of inmates' paperwork."  Urrutia Aff. ¶ 5, at 2.  The First Urrutia E-mail does not include the message body, but includes only the header of the electronic mail transmission, including from whom the electronic mail transmission was sent, when it was sent, to whom it was sent, and the subject.  See First Urrutia E-mail at 1.  Although the portions of the record to which the Defendants refer do not support the Defendants' asserted fact, Iverson's Affidavit describes her role:

> In 2011, I was the acting records manager as well as a corrections tech supervisor.
> In my capacity as tech supervisor, I oversaw the work of MDC technicians in the

minutes of receiving the facsimile transmission, Iverson sent Urrutia an electronic mail transmission reply, indicating that she had spoken with the MDC's district court liaison Laura Christison.  See Electronic Mail Transmission from Alexis M. Iverson to Brandi Brinkman-Urrutia, sent February 8, 2011 at 10:31 a.m., filed March 11, 2013 (Doc. 8-21)("Iverson E-mail"); Urrutia Aff. ¶ 6, at 2; MSJ ¶ 4, at 2 (setting forth this fact).  Christison advised that she had spoken with Mr. Pistone's office the previous day and advised that Mr. Pistone would have to submit an order setting conditions of release, and the court would have to approve it before the MDC could release Chavez from custody.  See Urrutia Aff. ¶ 6, at 2; Iverson E-mail; Iverson Aff. ¶ 8, at 3; Affidavit of Laura Christison ¶¶ 4-5, at 2, filed March 11, 2013 (Doc. 8-

_____

property, booking/release, and records department which processes all paperwork from the courts.  As the acting manager, I oversaw all records department operations to ensure that all unites were functioning efficiently.

Iverson Aff. ¶ 2, at 1.  The Policy: Booking Process, filed March 11, 2013 (Doc. 8-2)("Booking Process"), describes the role of a correction technician at the time of booking:

1. Ensure that the subject has been screened by Case Initiation and Medical #3 prior to booking subject in.

2. Ensure the inmate is of proper age for admission (check pre-booking form for D.O.B. or get a verbal date of birth from the inmate).

3. Ensure the arresting officer's name, man number and law enforcement agency is on the pre-booking form.

4. Ensure the charges are listed on the pre-booking form with the date and time of arrest.

5. Ensure Necessary Agency Holds are properly entered[.]

6. When applicable, ensure a judge's signature, sentence or court status is recorded.

Booking Process at 1.  The Court finds that there is undisputed evidence to support the asserted fact.

22)("Christison Aff."); MSJ ¶ 4, at 2 (setting forth this fact).  After receiving this information, it would have been customary for Urrutia to put the facsimile transmission in Rustin's inbox; she sent an electronic mail transmission to Iverson indicating that she intended to do so.  See Urrutia Aff. ¶ 7, at 2; Electronic Mail Transmission from Brandi Brinkman-Urrutia to Alexis M. Iverson, sent February 8, 2011 at 10:38 a.m., filed March 11, 2013 (Doc. 8-21)("Second Urrutia E-mail"); MSJ ¶ 5, at 2 (setting forth this fact).  The records department received a court order for conditions of release in Chavez's pending criminal case on February 10, 2011; the MDC processed Chavez' paperwork and released him later that day.  See Iverson Aff. ¶ 9, at 3; Order Setting Conditions of Release, filed March 11, 2013 (Doc. 8-14); Inmate Release Form, filed March 11, 2013 (Doc. 8-15); MSJ ¶ 6, at 3 (setting forth this fact).[7]

---

[7] The MSJ states:

> The records department received a court order for conditions of release in Mr. Chavez's pending criminal case from the District Court Liaison, Ms. Christison, on February 10, 2011.  Records staff conducted their due diligence in looking up the case and verifying the order and then processed Plaintiff's release, which occurred later in the day on February 10, 2011.

MSJ ¶ 6, at 3 (citing Iverson Aff. ¶ 9, at 3; Order Setting Conditions of Release; Inmate Release Form).  The local rules require a movant for summary judgment to "refer with particularity to those portions of the record upon which the movant relies."  D.N.M.LR-Civ. 56.1(b).  The Iverson Aff. states: "On February 10, 2011, the MDC received a court order setting conditions of release for Mr. Chavez.  Mr. Chavez's paperwork was processed and he was released from the MDC later in the day on February 10, 2011."  Iverson Aff. ¶ 9, at 3 (citations omitted).  Neither the Order Setting Conditions of Release nor the Inmate Release Form indicate that Christison sent the documents to the records department, or that the records staff conducted its due diligence.  Further, legal arguments should not be set forth in a party's asserted fact section during summary judgment.  See Ruiz v. City of Brush, 2006 WL 1816454, at *4 ("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute.  Legal argument . . . should be reserved for separate portions of the brief.'" (alterations in original)).  Whether the records staff conducted their due diligence is a question of law, and the Court will not address it in the factual section. See Wilson v. Jara, 866 F. Supp. 2d 1270, 1276-79 (D.N.M. 2011)(Browning, J.)("Whether this fact is relevant is a legal argument, and the Court will not address United States v. Abdenbi [361

- 6 -

Rustin has no specific recollection of taking any action in response to Mr. Pistone's request, but MDC internal policy, which was consistent with the American Correctional Association guidelines for correctional facilities, would not permit him to release Chavez without a court order setting conditions of release.[8] See Rustin Aff. ¶¶ 3-7, at 1-3, filed March 11, 2013 (Doc. 8-23); Releasing Procedures, filed March 11, 2013 (Doc. 8-24); American Correctional Association in cooperation with the Commission on Accreditation for Corrections, Performance-Based Standards for Adult Local Detention Facilities at 90 (4th ed., June 2004), filed March 11, 2013 (Doc. 8-25)("ACA Standards"); MSJ ¶ 7, at 3 (setting forth this fact). Rustin was familiar with MDC policy and was responsible for creating and instituting the policy. Rustin Aff. ¶ 2, at 1; id. ¶ 5, at 2; Response at 3. After the events, he determined that his staff "acted appropriately" in communicating with Mr. Pistone and in refusing to process Chavez' release from custody without a court order. Rustin Aff. ¶ 2, at 1; id. ¶ 5, at 2; Response at 3.[9]

---

F.3d 1282 (10th Cir. 2004),] at this time, but will consider it in its legal analysis."). The Court will modify the asserted fact in a manner consistent with the Iverson Aff., Order Setting Conditions of Release, and the Inmate Release Form, and will exclude the legal argument in the asserted fact.

[8] The MSJ further states that Rustin "could not have effectuated Chavez' release absent receipt of a court order setting conditions of release pursuant to MDC policy, which follows the American Correctional Association guidelines for correctional facilities." MSJ ¶ 7, at 3. Whether Rustin could have effectuated Chavez' release without a court order is a legal argument or conclusion, and not a factual assertion. See Ruiz v. City of Brush, 2006 WL 1816454, at *4 ("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute. Legal argument . . . should be reserved for separate portions of the brief.'" (alterations in original)).

[9] The local rules provide that the "Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies." D.N.M.LR-Civ. 56.1(b). Chavez made several statements in the Response which the Court understands to be attempts to

set forth additional facts, but Chavez did not letter these facts, nor did he refer with particularity the portions of the record on which he relies.  These statements include:

> In this case, as Chief of MDC, defendant Ramon Rustin is invested by the County of Bernalillo with the authority to operate, manage, and supervise the jail facility in Bernalillo County.  He institutes jail policies and procedures.  He hires, trains, and supervises employees who are to follow jail policies and procedures.  Those employees are required to follow his policies regarding inmate bookings and releases.  Mr. Rustin assigned employees to act on his behalf with respect to communications from attorneys and others regarding inmates. (See Affidavit of Rustin, Ex. D MSJ)

> As Chief of MDC, Rustin knew and approved of the inmate release policies in place when Mr. Chavez was incarcerated.  He approved of his staff following those policies.  He confirmed and approved his staff following MDC policies and his interpretation of NM law and ACA guidelines so that Mr. Chavez was not released until a court order setting conditions of release was submitted on Feb. 10, 2011.  See defendants Ex. D, Affidavit of R. Rustin.

> The undisputed facts show personal participation by Defendant Rustin, acting under color of state law as Chief of MDC, creating policies at MDC and training and supervising employees which resulted in the violation of Plaintiffs rights.

Response at 3 (citing the Rustin Aff., but not stating which paragraphs).  Chavez did not clearly set forth these additional facts, nor did he refer with particularity to which portion of the record he relies.  The Court has reviewed the Rustin Aff., which is the only portion of the record that Chavez cites for these facts; the Rustin Aff. supports the fact that Rustin holds a supervisory role at MDC, see Rustin Aff. ¶ 1, at 1, that he was familiar with MDC policies, see Rustin Aff. ¶ 2, at 1 ("I am familiar with both MDC policies and state law governing correctional operations in the State of New Mexico"), and that, after reviewing his staff's actions regarding Chavez, he approved their conduct:

> I have spoken with my staff and reviewed the email exchange between my assistant and the corrections tech supervisor which occurred on February 8, 2011, after Mr. Chavez's lawyer, Scott Pistone, faxed a letter and a stipulated order cancelling Mr. Chavez's warrant to the MDC administration office.

> * * *

> In line with the ACA guidelines, MDC policy, and state law, it is evident that my staff acted appropriately in communicating with Mr. Chavez's lawyer to provide him with the necessary information to bring about Mr. Chavez's release, namely, submitting an order for conditions of release with the judge presiding over Mr. Chavez's criminal case.   Furthermore, MDC staff acted lawfully and

## PROCEDURAL BACKGROUND

On February 4, 2013, Chavez filed his Complaint in state court against Rustin and Bernalillo County, alleging false arrest, false imprisonment, and illegal detention, and that the Defendants violated his right to be free from an unreasonable seizure pursuant to the Fourth Amendment to the Constitution of the United States of America.  See Complaint ¶¶ 8-11, at 2. The Defendants removed the case to federal court on March 2, 2013, asserting that the Court has original jurisdiction over Chavez' Fourth Amendment claims as claims under 42 U.S.C. §§ 1983 and 1988.  See Notice of Removal ¶ 4, at 2, filed March 2, 2013 (Doc. 1).  The Court has supplemental jurisdiction over the state law claims, including the false imprisonment and false arrest claims.  See Response at 9-10.

---

appropriately in refusing to process Mr. Chavez's release from custody without a proper court order in place.

* * *

I am satisfied that the MDC staff responded appropriately to Mr. Pistone's request that his client be released from custody.  I am also satisfied that MDC staff processed Mr. Chavez's release from custody in a timely manner upon receipt and verification that a Court had entered a conditions of release order for Mr. Chavez on February 10, 2011.

Rustin Aff. ¶¶ 4-6, at 2.  The Rustin Aff. does not support any of Chavez' additional assertions, but the Defendants do not dispute that Rustin created MDC policies.  See Reply at 9 ("Defendant Rustin is not disputing that he is a final policy maker or responsible for the policies at issue here.").  The Court will not accept the assertions that are not supported in the record; further, the Court will not accept the assertions that contain legal argument or conclusions, and not factual assertions, as undisputed facts.  See Ruiz v. City of Brush, 2006 WL 1816454, at *4 ("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute.  Legal argument . . . should be reserved for separate portions of the brief.'" (alterations in original)).  Although Chavez did not abide by the local rules in how he asserted additional facts, the Court will accept as undisputed the asserted facts that the record supports.

On March 11, 2013, the Defendants moved the Court for summary judgment, arguing that Rustin did not participate in the alleged conduct and is further entitled to qualified immunity, and that Chavez has failed to plead facts that invoke municipal liability.  See MSJ at 1.  The Defendants argue that Rustin is not responsible for Chavez' alleged false arrest, because the APD, not an MDC employee, arrested Chavez.  See MSJ at 8.  The Defendants argue that the "Plaintiff's arrest cannot be legally attributed to Defendant Rustin or any MDC employee, since jailers have no legal authority to arrest any person but rather are authorized solely to maintain custody of individuals who have been arrested by a law enforcement officer."  MSJ at 8 (citing N.M. Stat. Ann. § 33-3-28(D)(1)).  The Defendants explain that there are a limited number of situations in which jailers have "peace officer powers" -- when arresting on the jail premises, while transporting a person to jail, while supervising a person committed to or under the supervision of a jail, or when engaged in an effort to pursue or apprehend such a person -- and that none of those situations were present in this case, because an APD officer arrested Chavez "outside the detention facility, and his arrest was based on a warrant, rather than any conduct occurring while in MDC custody."  MSJ at 9 (citing N.M. Stat. Ann. § 33-3-28(A)).  The Defendants argue that Rustin is entitled to qualified immunity and is not liable for Chavez' false arrest.  See MSJ at 9.

The Defendants argue that Rustin is also entitled to qualified immunity for Chavez' false imprisonment claim, which they describe as a supervisory liability claim.  See MSJ at 9.  The Defendants assert that "supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts."  MSJ at 9 (citing Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)).  They contend that Chavez must demonstrate an

"affirmative link" between the "constitutional deprivation and either the supervisor's personal participation or his failure to supervise," and that Chavez must demonstrate that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." MSJ at 9 (citations omitted). Further, the Defendants assert that supervisory liability "requires a showing that such policies were a 'deliberate or conscious choice,'" and that Chavez must establish "at a minimum a deliberate and intentional act on the part of the defendant-supervisor to violate the plaintiff's legal rights." MSJ at 10-11 (quoting Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)). The Defendants contend that "[a] plaintiff can satisfy this prong by alleging that the defendant-supervisor had knowledge of the violation and acquiesced in its continuance." MSJ at 11 (citing Dodds v. Richardson, 614 F.3d 1185, 1195 (10th Cir. 2010)). Regarding the initial incarceration, the Defendants argue that state law does not permit a jailer to refuse to incarcerate an individual that a law enforcement officer brings to the MDC pursuant to state law. See MSJ at 11 (citing N.M. Att'y Gen. Op. No. 94-08, 1994 WL 721628; N.M. Stat. Ann. § 33-3-3). In the Defendants' view, neither Rustin nor any MDC employee could legally refuse to incarcerate Chavez when the APD brought Chavez to the MDC on an outstanding warrant. See MSJ at 11. Further, the Defendants contend that Chavez has not asserted any facts to support that Rustin personally participated in Chavez' initial incarceration. See MSJ at 11. Regarding Chavez' continued detention after Rustin received "formal notice" that Chavez was illegally detained, the Defendants argue that Rustin did not personally participate in that continuing detention; "[t]he fact that a fax was sent to Chief Rustin is insufficient to meet the personal participation

requirement."  MSJ at 12.  The Defendants argue that, even if Chavez could meet the "personal participation" requirement, Chavez cannot show that Rustin or any MDC employees acted "'with deliberate or reckless intent to falsely imprison[] the plaintiff,'" because New Mexico law required them to detain Chavez until receiving a court order for his release.  MSJ at 12 (quoting Romero v. Fay, 45 F.3d 1472, 1480 (10th Cir. 1995).  The Defendants direct the Court to N.M. Stat. Ann. § 33-3-12(B): "Any jailer who deliberately and knowingly releases a prisoner without an order of release as provided in this section, except upon expiration of the prisoner's term of commitment, is guilty of a misdemeanor and shall be removed from office."  MSJ at 12 (quoting N.M. Stat. Ann. § 33-3-12(B)).  They assert that the Tenth Circuit has "rejected the argument that a jailer can be held liable for refusing to investigate an inmate's claim that he is being wrongfully held by a jailer," MSJ at 12 (citing Scull v. New Mexico, 236 F.3d 588, 597 (10th Cir. 2000)), and that the Supreme Court of the United States of America has similarly held that an "'official charged with maintaining custody of the accused named in the warrant is [not] required by the Constitution to perform an error-free investigation of [a claim of innocence],'" MSJ at 13 (alteration in original)(quoting Baker v. McCollan, 443 U.S. 137, 146 (1979)).  The Defendants emphasize that, because there was not a court order to release Chavez until February 10, 2011, and the MDC released him later that day, the MDC employees did not violate Chavez' constitutional rights, Rustin cannot have supervisory liability, and clearly existing law precludes Chavez' claim, "because jailers have no authority to release an inmate even if s/he is innocent of the charges which resulted in his or her incarceration."  MSJ at 13.  The Defendants contend that, had Rustin released Chavez from custody on February 8, 2011, Rustin would face potential criminal prosecution.  See MSJ at 13-14.

The Defendants assert that Chavez failed to state a claim against Bernalillo County for municipal liability; to the extent that the municipal liability claim could be construed to include Rustin, the Defendants argue that the Court should dismiss Rustin from the suit, because they contend that courts "routinely dismiss the official capacity claims as redundant when brought against the municipality and an official in his/her official capacity." MSJ at 14. The Defendants further argue that "a municipality may not be held liable under 42 U.S.C. § 1983 simply because it employs a person who violated a plaintiff's federally protected rights," but that Chavez must show "(1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged." MSJ at 15. In the Defendants' view, Chavez did not allege either prong of the two-part test. See MSJ at 15 (citing Complaint ¶ 9, at 2 ("The willful detention of Plaintiff by Bernalillo County after receiving notice that his arrest was unlawful and that the purported bench warrant was cancelled was intentional and malicious and done with knowledge of the unlawful harm being done to Plaintiff.")). The Defendants argue that, even had Chavez properly pled a municipal liability claim, the Court should dismiss it, because Chavez cannot show that a municipal employee committed a constitutional violation. See MSJ at 16.

At the initial scheduling conference on June 14, 2013, the Court noted that the Defendants filed the MSJ and that Chavez had not responded; the Court asked the parties how they would like to proceed. See Liberty Court Player at 2:03-2:53 (Court)(taken June 14, 2013)("Liberty"). Chavez explained that it would be premature for him to respond to the qualified immunity arguments without further discovery regarding Rustin's participation and requested that the Court postpone the hearing for at least seventy-five days until he has had an

opportunity to conduct discovery. See Liberty at 2:56-4:08 (Lash). The Defendants noted that they filed the MSJ in April, 2013, that Chavez had not responded, and that he had not requested an extension of time; they contended that under Ashcroft v. Iqbal, 556 U.S. 662 (2009), they would be entitled to a stay of discovery for their qualified immunity defense unless Chavez could identify with specificity the discovery he needs to respond to the MSJ. See Liberty at 4:27-5:01 (Baker). The Defendants admitted that the case is a bit unusual in that they filed the MSJ with the Defendants [sic] Answer to Complaint for False Arrest, False Imprisonment and Damages, filed March 11, 2013 (Doc. 7), but they argued that the case is an easy one and that they should not have to spend much more money defending the case. See Liberty at 5:01-5:25 (Baker). The Court noted that it would not save anyone time to move forward with the MSJ hearing if Chavez could demonstrate a need for discovery, and asked whether, from the Defendants' perspective, Chavez would need any discovery to respond to the MSJ. See Liberty at 5:30-5:58 (Court). The Defendants explained what they contended were undisputed facts -- that the APD arrested Chavez and turned him over to the MDC, that the MDC could consider only the four corners of the warrant when booking Chavez, and that, to release Chavez, the MDC needed a valid court order before releasing Chavez. See Liberty at 6:02-6:44 (Baker). Although Mr. Pistone sent information regarding a cancelled warrant, the Defendants explained that jail personnel face many different communications with people who purport to be judges or lawyers, demanding the release of prisoners, and to protect against improperly releasing prisoners, the MDC refuses to acknowledge those communications and requires a court order. See Liberty at 7:16-7:60 (Baker). In this case, Iverson called Mr. Pistone to tell him that the MDC would need a court order to release Chavez and that the cancelled bench warrant was insufficient to release Chavez.

See Liberty at 7:51-8:25 (Baker).  The MDC released Chavez the same day it received the court order.   See Liberty at 8:25-8:38 (Baker).   The Defendants asserted that these facts are undisputed, and that the only discovery that Chavez could need would relate to whether the jailers misinterpreted state law and whether they have authority to release prisoners without a signed court order, but that they are not sure what additional discovery would add to what is already known.  See Liberty at 8:38-9:05 (Baker).

Chavez clarified that there was never a warrant that authorized Chavez to be arrested or incarcerated; the Court noted that Chavez could establish that as an additional fact by attaching an affidavit to his response, even if the Defendants contend that the fact is irrelevant.   See Liberty at 9:30-10:20 (Lash, Court).  Chavez argued that he needed additional discovery to show that the MDC does not need a court order to release prisoners and that the statutes on which the MDC relied did not justify keeping Chavez incarcerated.   See Liberty at 10:45-12:05 (Lash, Court).  The Court asked again what Chavez needs for discovery, as many of his statements appeared to be legal in nature; Chavez answered that he needs discovery from Rustin, such as whether he instituted the policy that prevented the MDC employees from releasing Chavez without a court order when, according to Chavez, the MDC releases prisoners without court orders in other situations, as well as discovery relating to other prisoners and whether they are treated differently, and more information about the policy itself, such as how it compares to the American Correctional Association ("ACA") standards, whether the policy is constitutional, and whether the MDC employees followed the policies.  See Liberty at 12:07-14:28 (Court, Lash).

The Court directed Chavez to respond to the MSJ; the Court said it would not place a stay on discovery, but advised Chavez to proceed with discovery cautiously, because it was inclined

to let Mr. Baker, the Defendants' counsel, control the amount of discovery in the case.  <u>See</u> Liberty at 14:30-16:06 (Court).  The Court said that, if Chavez feels as though he cannot get the discovery he needs, then he could file a rule 56(f) affidavit to request specific discovery, but at this point, the Court said it did not think it could make an informed decision regarding what discovery it would permit or deny, based on the qualified immunity defense, and so it encouraged the parties to work through the issues and come back to the Court with specific issues if they arose.  <u>See</u> Liberty at 16:06-18:05 (Lash, Court).  The Defendants pointed out they had included some of the discovery that Chavez requested in the MSJ; the Court encouraged Chavez to look closely at the evidence attached to the MSJ.  <u>See</u> Liberty at 18:06-18:45 (Baker, Court).  Chavez asked for the police report and booking sheet, and the Defendants said they would provide that discovery by the following week.  <u>See</u> Liberty at 19:10-19:25 (Lash, Baker). The Court set a hearing on the MSJ for July 2, 2013.  <u>See</u> Liberty at 19:35-40.  The Court clarified that it would not enter a stay on discovery at that time, partially because the Defendants seemed to agree that a limited amount of discovery may be appropriate, but encouraged Chavez to focus his discovery on the issues in the MSJ and, if there were discovery disputes, it would likely grant the Defendants' request for a discovery stay and Chavez could file a rule 56(f) affidavit for the Court to address at the summary judgment hearing.  <u>See</u> Liberty at 33:08-32:08 (Court).

Chavez filed his Response on June 29, 2013, arguing that he has "an unquestioned right to be free from seizure and imprisonment without due process of law under the 14th Amendment to the U.S. Constitution," and under Article II, Sections 4 and 18 of the New Mexico Constitution.  Response at 2.  He argues that a jailer's "fundamental duty" is to "incarcerate only

those persons where there is legal cause to take away their fundamental right to liberty in conformance with appropriate Due Process under the U.S. and New Mexico Constitutions." Response at 2.  Chavez contends that his arrest warrant had been previously quashed, that Rustin was notified that Chavez was "arrested in error," that Rustin's staff informed Chavez' counsel that the MDC policy required an order from a judge to release Chavez, and that MDC refused to release Chavez until they received the new court order.  See Response at 2.  Chavez contends that he is "at a disadvantage at this stage of the case before discovery is obtained," but asserts that the facts that the Defendants set forth demonstrate that Rustin personally participated in "creating policies at MDC and training and supervising employees which resulted in the violation of Plaintiff's rights."   Response at 3.   "More details of his actual knowledge, involvement in training and policies, and with Plaintiff's incarceration will be revealed in discovery."  Response at 3.

Chavez contends that Bernalillo County is liable for his alleged false arrest and false imprisonment; he asserts that the policies that Rustin instituted, ratified, or enforced "are policies adopted by the County of Bernalillo because they apply to all persons who are brought to the MDC operated by the County."  Response at 3-4.  Chavez argues that MDC participated in his false arrest, because an "arrest is completed when custody of an arrestee is transferred to the MDC.  State law and MDC procedures require proper documentation and/or legal cause to be presented by an arresting officer before accepting any arrestee into custody."  Response at 4 (citing The Policy: Booking Process, filed March 11, 2013 (Doc. 8-2)("Booking Process"), which states that a correction technician at the time of booking shall "[e]nsure the charges are listed on the pre-booking form with the date and time of arrest," and, "[w]hen applicable, ensure

a judge's signature, sentence or court status is recorded."). Chavez requests additional discovery to determine "[e]xactly what MDC employees did to verify the validity of the cancelled warrant . . . ." Response at 4.

Chavez argues that the Defendants' defenses are "premature or inapplicable"; regarding Rustin's qualified immunity defense, Chavez contends that, because Rustin "instituted, directed, and ratified" the MDC policies, and those policies resulted in Chavez' continued imprisonment, Rustin's conduct is "affirmatively linked" to Chavez' injury, precluding qualified immunity. Response at 5-6. In Chavez' view, Rustin's conduct was "deliberate and intentional," because his "affidavit demonstrates no concern whatsoever for the illegal detention of Plaintiff and makes clear that the policies that wrongfully detained Plaintiff were intentional and will continue to affect future illegally detained persons," and because Rustin admitted that Mr. Pistone's notice would not affect Rustin's decision to detain Chavez. Response at 6. Chavez argues that Rustin's stated justifications for continuing to detain Chavez are inadequate, because "[j]ail policies cannot unreasonably infringe constitutional rights." Response at 6.

Chavez disagrees with the Defendants' reliance on Scull v. New Mexico and asserts that, in that case, the plaintiff was arrested based on a valid warrant from another state, but the parties disagreed how a New Mexico judge's ruling in another county affected the warrant; in this case, Chavez contends that "the parties here know that *no warrant existed*" when Chavez was arrested and incarcerated. Response at 7 (emphasis in original)(citing State Docket for proposition that the parties knew no warrant existed). Although the Defendants argue that state law did not allow the MDC to refuse to incarcerate Chavez, Chavez contends that the authorities that the Defendants cite "makes clear that there must be a proper commitment by competent authority

- 18 -

according to law."   Response at 7 (emphasis omitted)(citing N.M. Stat. Ann § 33-3-12; N.M. Att'y Gen. Op. No. 94-08)).   Further, Chavez contends that the Defendants admit that the jailer had a duty to determine the facial validity of the warrant; in Chavez' view, the Defendants confuse the issue by equating this analysis to determining Chavez' guilt or innocence.   See Response at 7.   Chavez contends that, when the "MDC refused to verify the expiration of the warrant," they violated N.M. Stat. Ann. 33-3-12(B) by refusing to "release a person 'under expiration of the prisoner's term of commitment.'"   Response at 7 (quoting N.M. State. Ann. § 33-3-12(B)).   Chavez warns the Court that the Defendants' legal defense will lead to repeated wrongful imprisonments in Bernalillo County, New Mexico.   See Response at 7-8.

Chavez asks the Court for further discovery to determine the MDC's policies and procedures, whether they were followed, the source of the policies, Rustin's role in implementing the policies and procedures, Rustin's knowledge and participation regarding Chavez' incarceration and demand for release, Rustin's knowledge of ACA policies, whether Rustin believed he could be prosecuted for releasing Chavez without a court order and whether that belief was reasonable, whether the MDC had a facially valid bench warrant, and when the MDC staff independently verifies court records.   See Response at 8.   Chavez asserts that the Defendants have not provided documents that they promised to provide, including the police report and booking sheet; he contends that the documents bear directly on whether the MDC employees had a facially valid warrant when Chavez was arrested and booked into MDC.   See Response at 9.   In Chavez' view, "there should be no real argument by defendants that a valid warrant *actually existed* at the time of Plaintiff's arrest and booking."   Response at 9 (emphasis in original).   Chavez urges the Court to consider the implication of the Defendants' argument --

that there "should be no legal consequences if Mr. Chavez was arrested and incarcerated based on a warrant that was invalid at the time of his arrest."  Response at 10 (emphasis omitted).  He argues that a "mistaken arrest, invalid on its face, is insufficient justification to take away someone's liberty for an indeterminate length of time (days-months-years) until the person arrested without cause is able to convince people outside the jail cell to engage the legal machinery required by MDC policies to have him released."  Response at 10.

        The Defendants reply that Chavez has not demonstrated a viable cause of action or the need for discovery, because "it is uncontested" that the Defendants did not arrest Chavez, that Chavez was booked in the MDC on a facially valid warrant, that the Defendants did not have an independent duty to investigate the validity of the warrant, that they could not release Chavez until a judge issued a release order, and that the Defendants released Chavez the same day they received the order.  Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment at 1, filed July 1, 2013 (Doc. 24)("Reply").  The Defendants argue that they did not arrest Chavez and, although Chavez argues that the Defendants participated in the arrest when he was transferred to the MDC, the Defendants point out that Chavez did not cite any authority for that proposition.  Reply at 2.  Because the Defendants contend that they did not participate in Chavez' arrest, they argue that further discovery is not required or warranted.  See Reply at 2.  The Defendants explain that the Honorable Jacqueline D. Flores, District Judge for the Second Judicial District, State of New Mexico, issued a bench warrant on January 20, 2011, after Chavez failed to appear for a plea hearing; although Judge Flores signed a stipulated cancellation of this warrant on January 28, 2011, "the bench warrant was still open on February 5, 2011.  Defendants do not know why the warrant was still open, but this was fully outside

Defendants' control."   Reply at 2.   The Defendants argue that the MDC employees were presented with a facially valid bench warrant and that they recorded the basis for Chavez' arrest; the Defendants contend that the intake process "was in full accord with MDC policy" and that policy did not require MDC employees to do anything more than review the bench warrant to determine if it appeared to be facially valid.   Reply at 2.   Although Mr. Pistone sent the Stipulated Order to Rustin, the Defendants argue that "state law definitely prohibits any jailer from releasing an inmate absent a court order expressly ordering the inmate's release."   Reply at 2-3 (citing N.M. Stat. Ann. § 33-3-12(B)).   The Defendants emphasize that "a stipulated dismissal of a warrant is NOT a court ordered release from custody," and, thus, Rustin could not have released Chavez based on the Pistone Fax.   Reply at 3 (emphasis in original).   In response to Chavez' arguments that Rustin demonstrated indifference to Chavez' rights, the Defendants argue that state law would not allow Rustin to release Chavez based on the Pistone Fax and that, "[i]f anything, Plaintiff's timely release on the same day that the MDC received the release order wholly contradicts Plaintiff's vague deliberate indifference claims."   Reply at 3.   The Defendants note that "there is no indication" that Mr. Pistone asked Judge Flores to release Chavez until several days after he was arrested, and that Chavez is improperly shifting blame to the Defendants for his continued incarceration even though they did not have control over the court orders or warrant processing.   Reply at 3.

The Defendants contend that Rustin did not have a duty to investigate a facially valid warrant and that Chavez' warrant contained the required information to make it facially valid, including the reason for the warrant -- Chavez' failure to appear at a plea hearing.   See Reply at 4.   The Defendants provide examples of when the Tenth Circuit has "refused to hold jailers

responsible for constitutional violations based on the fact that the warrant underlying a complainant's arrest turns out to be erroneous."  Reply at 4-5 (citing Dry v. United States, 235 F.3d 1249, 1259 (10th Cir. 2000)(explaining that a jailer does not need to analyze the probable cause for an arrest unless there is an objectively apparent lack of a basis for detention that should arouse suspicion); Turney v. O'Toole, 898 F.2d 1470, 1472-73 (10th Cir. 1990)(granting qualified immunity where there was a facially valid warrant even though it allegedly violated several state statutes)).  The Defendants contend that the Tenth Circuit cases, along with a number of cases from other circuits, magnify the flaws in Chavez' allegations, because the cases demonstrate that, once the MDC determined that Chavez was arrested on a facially valid warrant, they did not have a duty to further investigate the warrant.  See Reply at 6 (citations omitted).  In the Defendants' view, the jailers could not have relied on the State Docket, because the MDC did not have authority to release Chavez based on the Stipulated Order.  See Reply at 6-7.  The Defendants assert that Chavez' "duty argument and alleged unlawful detention argument are simply unsupported by the law and facts of this case."  Reply at 7.  In response to Chavez' attempts to distinguish Scull v. New Mexico, the Defendants acknowledge that the record in that case was more fully developed and the facts are distinguishable, but they assert that Chavez' reliance on the State Docket as proof that the Defendants knew or should have known that the bench warrant was not valid "would negate a whole body of law indicating otherwise."  Reply at 8.  "The fact that the warrant had been cancelled has no bearing on whether Defendants violated Plaintiff's civil rights or committed any wrongdoing when they booked Plaintiff into the facility on a facially valid warrant and detained him until the presiding criminal court ordered his release from the MDC."  Reply at 8.

The Defendants argue that Rustin is entitled to qualified immunity, because "no constitutional violation occurred."   Reply at 7.   Without a constitutional violation, the Defendants assert, Rustin's state of mind is irrelevant.   See Reply at 7-8.   The Defendants acknowledge that it is "unfortunate that the cancelled bench warrant was somehow left open," but they contend that Rustin "can hardly be held responsible for this error."   Reply at 7-8. Without a constitutional violation, the Defendants also assert, the municipal liability claims are "untenable."   Reply at 8-9.   The Defendants contend that Chavez' request for discovery is unwarranted.   See Reply at 9.   In response to Chavez' request for the police report, the Defendants assert that they do not have a copy of that report, and, further, they did not arrest Chavez or book him into the MDC based on the police report, and so it would not be useful in this case.   See Reply at 9.   Further, the Defendants point out that Chavez could have obtained the copy of the police report through the public records.   See Reply at 9.   The Defendants dispute the remaining areas of requested discovery as "unnecessary, irrelevant, not calculated to lead to the discovery of admissible evidence, and otherwise futile."   Reply at 9.   Regarding the source of the MDC policies, the Defendants explain that Rustin does not dispute that he is a final policy maker and responsible for the policies at issue; regarding the content of the booking and policy procedures, the Defendants explain that they attached them to their MSJ; regarding Rustin's knowledge of Chavez' case and whether Rustin believed he could be prosecuted for releasing Chavez without a warrant, the Defendants assert that they included this information in Rustin's affidavit; and regarding Rustin's knowledge of the ACA policies, the Defendants argue that, even if the MDC policies or conduct violated the ACA standards, such a violation would not be actionable or proof for a § 1983 violation.   See Reply at 9-10.

- 23 -

The Defendants argue that Chavez' state law claims also must fail, because the Defendants did not arrest Chavez, and so "any claim for false arrest is not actionable."  Reply at 10.  In the Defendants' view, the false-imprisonment claim must also fail, because "Rustin had lawful authority to detain Plaintiff based on the facially valid warrant and state law."  Reply at 10-11 (citing N.M. Stat. Ann. § 33-3-13).  Further, the Defendants contend that the MDC employees released Chavez consistent with state law by releasing him the same day they received a release order.  See Reply at 11.  The Defendants argue that Bernalillo County is immune from liability under the New Mexico Tort Claims Act, N.M. Stat. Ann. §§ 41-4-1 to -30 ("NMTCA"), because Rustin did not falsely imprison Chavez.  See Reply at 11.  In the Defendants' view, there are no material factual disputes, and the law supports summary judgment.  See Reply at 11.  Further, according to the Defendants, "[t]he short duration of Plaintiff's incarceration is also a factor in negating Plaintiff's allegations."  Reply at 11-12 (citing Baker v. McCollan, 443 U.S. at 145-46).  The Defendants maintain that they did not have a legal responsibility for the bench warrant, and they point instead to the fact that Chavez' attorney "did not immediately seek a release order from the judge who issued the bench warrant."  Reply at 12.  The Defendants request that the Court deny any further discovery and grant the MSJ.  See Reply at 12.

The Court held a hearing on July 2, 2013.  See Transcript of Hearing, taken July 2, 2013 ("Tr").[10]  The Defendants argued that the facts of this case are straightforward -- Chavez failed to show up for a court hearing, and so Judge Flores issued a bench warrant; she subsequently cancelled the bench warrant based on Chavez' explanation that he was confused as to when he

---

[10]  The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

was supposed to appear, but for a reason unknown to the Defendants, the warrant was still open when the APD arrested Chavez on February 5, 2011.  See Tr. at 3:20-4:5 (Baker).  The Defendants explained that the Stipulated Order was filed in the state district court on January 28, 2011, and it shows that the district attorney who was handling the case telephonically approved the order, that someone signed on behalf of Mr. Pistone, and that the Honorable Denise Barela Shepherd, District Judge for the Second Judicial District, State of New Mexico, signed on behalf of Judge Flores; the Defendants said they assumed that the Stipulated Order was filed with the district court clerk.  See Tr. at 4:9-20 (Baker).  Mr. Baker said he did not know how that information would be transmitted to the APD; he understood that the APD officer gave the MDC a copy of the original bench warrant, and under state law, the jailer ensures only that the person who is being booked has a facially valid warrant, unless the police arrested the person during the commission of a crime or another situation in which there would not be a warrant.  See Tr. at 4:21-5:10 (Baker).  The Defendants contended that the bench warrant, which was filed in state court on January 20, 2011, had all of the appropriate information -- the defendant's name, date of birth, social security number, weight and height, color of eyes and hair, case number, directive to any New Mexico officer authorized to execute the warrant to arrest Chavez, the reason for the warrant, that charges were being lodged against Chavez, the district court judge's signature, and information regarding the amount of the bond.  See Tr. at 5:11-23 (Baker).  The Defendants contend that, after ensuring that the warrant was facially valid, the MDC's responsibility was complete, and it could not release Chavez without a valid release order.  See Tr. at 5:24-6:2 (Baker).  The Court noted that state law may instruct a jailer to look only at whether the warrant is facially valid, but asked whether state law would impact the federal issue and question of

qualified immunity.  See Tr. 6:8-7:5 (Court).  The Defendants argued that Rustin is entitled to qualified immunity, that the people who booked Chavez into jail are civilians who work at the jail and are entitled to rely on state law, and that Skull v. New Mexico makes it clear that there are no constitutional or statutory requirements that a jailer must independently investigate claims of innocence.  See Tr. 7:6-19 (Baker).  The Defendants said that, with the difficulty in keeping jails staffed, the requirements to become a jailer are not very high, and so it would be "inappropriate and unreasonable" to expect a jailer to independently investigate whether the arresting officer had probable cause and whether a prisoner has a legitimate claim to be released.  Tr. at 7:24-8:14 (Baker).  The Defendants clarified that they are arguing both that Rustin did not participate in any constitutional violation and that the jailers did not have a constitutional duty to investigate beyond ensuring that the bench warrant was facially valid.  See Tr. at 8:19-9:9 (Court, Baker).  The Defendants directed the Court to the facts in Scull v. New Mexico, in which the Bernalillo County jail director received information that the plaintiff should be released from the Taos County, New Mexico jail, but because the order did not mention Bernalillo County, the jail director kept the plaintiff in custody; the Tenth Circuit said it did not approve of the jail director's failure to call the issuing court to obtain a release order for Bernalillo County, but said that the jail director's reliance on the paperwork available to him did not violate the plaintiff's constitutional or statutory rights.  See Tr. at 9:10-10:1 (Baker).  In this case, the Defendants explained that Iverson went beyond what was required and called Mr. Pistone's office for a release order, and although the Defendants do not know why it took until February 10, 2011, to receive that order, they released Chavez the day they received it.  See Tr. at 10:2-15 (Baker).  The Defendants asserted that the process worked the way it was supposed to work in this case,

and although it is unfortunate that the bench warrant was still open, the Defendants took the steps they could to get Chavez released.  See Tr. at 3-13 (Baker).  The Defendants said that the Tenth Circuit's decision in Scull v. New Mexico is consistent with other circuits, including the Fourth, Fifth, Seventh, and Eleventh Circuits.  See Tr. at 11:14-12:3 (Court, Baker).

Chavez directed the Court to Dry v. United States, a case that the Defendants cited in their Reply; he pointed out that the Tenth Circuit stated that, "absent any objectively apparent lack of a basis for a detention which should arouse suspicion, a jailer cannot be expected to assume the mantle of a magistrate to determine the probable cause for an arrest."  Tr. at 12:14-21 (Lash)(quoting Dry v. United States, 235 F.3d at 1259)(internal quotation marks omitted)).  Chavez emphasized that, in this case, the judge cancelled the warrant before Chavez was arrested, that the New Mexico statutes require a proper commitment before booking a person into jail, and that the initial commitment was improper in this case, because the warrant was cancelled before the APD arrested him.  See Tr. at 12:22-13:12 (Lash).  Chavez argued that the MDC's policy, which Rustin instated, does not permit someone who has been erroneously arrested to be released until a court orders his release; instead of validating whether the warrant was cancelled, Chavez complained that Christison pointed to the MDC policy and said that the MDC does not release prisoners without a court order, even if arrested erroneously.  See Tr. at 12:22-14:12 (Lash).  Chavez argued that his case is different from Scull v. New Mexico, because, while the warrant was valid when Judge Flores issued it, it was not valid at the time of the arrest.  See Tr. at 14:15-15:4 (Court, Lash).  After the Court asked what happened to indicate to the APD that the warrant was still valid, Chavez explained that, while he does not know what the Defendants mean when they say that the warrant was still "open," he knows that the State

- 27 -

Docket showed that the warrant was quashed and he suspects that the APD officers have a method of checking outstanding warrants. Tr. at 15:5-16:2 (Court, Lash). Chavez argued that "there's a duty to make sure that there's a legitimate warrant" and that, in this case, the warrant did not exist. Tr. at 16:9-16 (Lash). The Court asked what Chavez meant by saying that the warrant did not exist, because the APD had the bench warrant when it turned Chavez into MDC; Chavez answered that the warrant was cancelled before the APD arrested him and that information was available to the public on the State Docket. See Tr. at 16:17-17:14 (Court, Lash). The Court noted that the officers were not likely looking at the State Docket, but that someone else was probably providing them with the warrants. See Tr. at 17:4-7 (Court). The Court questioned why a jailer should have to question the reason for the officer's arrest, noting that issues such as whether the officer had reasonable suspicion or probable cause would be better evaluated by a court, and that it seemed as though Chavez' concern would be better aimed at whether the APD unlawfully arrested him rather than whether the MDC unlawfully detained him. See Tr. at 17:23-19:6 (Court). The Court also noted that, even after the MDC received notice that the warrant was cancelled, the employees would need some method to ensure that there was not some other reason to detain Chavez; Chavez argued that the court liaison could have checked Chavez' record to determine if there was any other reason to detain Chavez and then released him. See Tr. at 19:14-21:5 (Court, Lash). Chavez contended that the MDC policies violate the United States Constitution and the New Mexico Constitution, because the policy of keeping someone incarcerated when there is no valid warrant violates a person's due process rights. See Tr. at 21:6-17 (Lash). He argued that the problem was the MDC's unwavering application of the MDC policy and how nothing besides an order from a judge could

release Chavez, emphasizing the Court's earlier point that not all policies are consistent with the Constitution.  See Tr. at 21:21-25 (Lash); id. at 22:18-24 (Lash).

Chavez pointed out that both sides recognize there was an error, and requested discovery to determine how it happened that Chavez was arrested when his bench warrant was cancelled. See Tr. at 22:4-6 (Lash).  The Court asked whether there were any factual issues for which Chavez needed further discovery, noting that the parties did not dispute that the bench warrant was cancelled on January 28, 2011, or that the APD officers presented the bench warrant when they booked Chavez into the MDC.  See Tr. at 26:10-27:22 (Court, Lash).  Chavez said he thought he would need discovery regarding what happened between the time he arrived at the MDC and when he was released, including why Christison, the court liaison, got involved in the case.  See Tr. at 28:12-29:4 (Lash).

The Defendants clarified that there were three separate government agencies involved: (i) the state courts and their clerk's office, which issued and processed the warrant; (ii) the APD, which arrested Chavez; and (iii) the MDC, which took Chavez into custody and kept him until there was a valid release order.  See Tr. at 29:10-18 (Baker).  The Defendants emphasized that, in the Tenth Circuit and every other circuit they had researched, "a jailer has no duty to investigate. Zero."  Tr. at 29:19-21 (Baker).  The Court said that the law did not seem as strong as the Defendants conveyed and that the law requires a jailer to consider whether there is an absence of objectively apparent basis for detention, which would arouse suspicion.  See Tr. at 29:23-30:3 (Court).  The Defendants clarified that Dry v. United States, which contains the standard the Court stated, requires the jailers to determine at the front end whether there is an objectively reasonable basis for detention, but that a jailer does not have a duty to investigate

later.  See Tr. at 30:4-8 (Baker).  The Defendants noted that the MDC did more than what was required in this case, because it informed Mr. Pistone what he needed to do to get Chavez released; when he obtained the court order, the MDC released Chavez.  See Tr. at 30:24-31:9 (Baker).  The Defendants urged the Court to keep in mind the narrow issue in the case -- whether the MDC violated Chavez' constitutional rights or rights under the NMTCA when it held Chavez in custody until it received an order from Judge Flores ordering Chavez' release.  See Tr. at 31:18-22 (Baker).  The Court asked whether the Defendants agreed with its suggestion that the constitutional violation seems to have occurred, if ever, before Chavez was booked into the MDC; the Defendants admitted the case would be different had Chavez sued the APD.  See Tr. at 31:25-32:12 (Court, Baker).  The Defendants explained that, once a person is booked into a jail, there are two ways to release someone from custody -- either the person serves his or her time, or the person stays in jail until a court orders his or her release.  See Tr. at 32:18-24 (Baker).  In the Defendants' view, the system was designed to rely on judges and their authority, removing any question whether jailers can second guess probable cause or other reasons for a person's arrest.  See Tr. at 32:24-33:7 (Baker).  The Defendants noted that, if there was no constitutional violation, there would also not be municipal liability.  See Tr. at 33:8-16 (Court, Baker).

Chavez explained that, as part of the MSJ, the Defendants assert that there are only three grounds for releasing prisoners -- (i) when a court orders a prisoner's release; (ii) when a bond has been posted; and (iii) when the sentence is completed.  See Tr. at 34:2-6 (Lash).  Chavez contends that there are more grounds for releasing prisoners than just those three scenarios, such as when the statutory time limit passes to bring charges and a jail has to release a prisoner

without a court order because no case has been filed, when a jail has discretion to release prisoners because of overcrowding, or when, as in Chavez' case, the arrest was facially invalid. See Tr. at 34:7-37:16 (Court, Lash).  Chavez contended that the ACA guidelines would reveal these additional grounds for releasing prisoners without court orders, and argued that the Defendants' assertion that they needed a separate court order is not true.  See Tr. at 37:21-38:5 (Lash).  The Defendants disputed that Rustin could release prisoners due to overcrowding, asserting that the MDC cannot release any prisoners without a court's permission.  See Tr. at 38:23-39:10 (Baker).  The Defendants noted that the ACA can make recommendations, but those recommendations are not equivalent to the constitutional requirements, and, thus, the ACA guidelines are irrelevant to the Court's constitutional analysis.  See Tr. at 39:11-18 (Baker).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Schs., No. CIV 11-0422 JB/KBM, 2013 WL 3462484, at *23 (D.N.M. June 28, 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp v. Catrett, 477 U.S. at 331

(Brennan, J., dissenting)(emphasis in original).[11]   Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.   See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."   Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).   Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."   Fed. R. Civ. P. 56(c)(1).   It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."   Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.   See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported

---

[11]   Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.   See 10A C. Wright & A. Miller, Federal Practice & Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party,

there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the Court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified-immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 547, 586–587 (1986)(footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–248 (1986).  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]"   York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir.2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir.2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  "The Tenth Circuit, in Rhoads v. Miller, [352 F.

App'x 289 (10th Cir.2009)(Tymkovich, J.)(unpublished),[12]] explained that the blatant

_____

[12] Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value

contradictions of the record must be supported by more than other witnesses' testimony[.]"

Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M.2010)(Browning, J.)(citation

omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395–96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291–92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291–92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

---

with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, Tadlock v. Lahood, 2013 WL 6284428 (10th Cir. Dec. 5, 2013)(unpublished); Lobozzo v. Colo. Dep't Of Corr., 429 F. App'x 707 (10th Cir. 2011)(unpublished); Muller v. Culbertson, 408 F. App'x 194 (10th Cir. 2011)(unpublished); and McCormick v. Farrar, 147 F. App'x 716 (10th Cir. 2005)(unpublished) have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

that will serve as the foundation for answering the legal question before the court" before inquiring into whether there are genuine issues of material fact for resolution by the jury. 584 F.3d at 1326–27 (Holmes, J. concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING RULE 56(d)

Rule 56(d) provides:

**(d) When Facts Are Unavailable to the Nonmovant.**

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

**(1)** defer considering the motion or deny it;

**(2)** allow time to obtain affidavits or declarations or to take discovery; or

**(3)** issue any other appropriate order.

Fed. R. Civ. P. 56(d). Before 2010, this rule was rule 56(f); rule 56(d) "carries forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. P. 56(d) advisory committee committee's note to the 2010 amendments. "A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion." Fed. R. Civ. P. 56(d) advisory committee committee's note to the 2010 amendments. The rule permits a nonmovant to show by affidavit or declaration the need for additional discovery; a formal affidavit is thus not required. See Fed. R. Civ. P. 56(d). The rule permits a "written unsworn declaration, certificate, verification, or statement subscribed in proper form as

true under penalty of perjury to substitute for an affidavit."   Fed. R. Civ. P. 56(c) advisory committee committee's note to the 2010 amendments.

When a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the court's discretion.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d 1550, 1553-54 (10th Cir. 1993).  "Unless dilatory or lacking in merit," a party's 56[(d)] application "should be liberally treated."   998 F.2d at 1554 (internal quotation marks and citations omitted).  "The general principle of Rule 56(d) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition."  Price ex rel. Price v. W. Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000).  Rule 56(d) does not require, however, that summary judgment not be entered until discovery is complete.  See Price ex rel. Price v. W. Res., Inc., 232 F.3d at 784.

"Rule 56[(d)] is not a license for a fishing expedition. . . ."  Lewis v. Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990).  To invoke rule 56(d) the party filing the affidavit or declaration must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554. Rule 56(d) may not be invoked based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.   Moreover, while the summary judgment movant's exclusive control of information weighs heavily in favor of relief under 56(d), see Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783, merely asserting such is insufficient to justify denial of summary judgment, see Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Furthermore, "if the party filing the Rule 56[(d)] affidavit has

been dilatory, or the information sought is either irrelevant to the summary judgment motion or

merely cumulative, no extension will be granted."  Jensen v. Redevelopment Agency of Sandy

City, 998 F.2d at 1554 (denying a 56(d) request stating "the record reflect[ed] that plaintiffs were

dilatory in pursuing discovery prior to the filing of their 56[(d)] affidavit").  See Johnson v.

Holmes, 377 F. Supp. 2d 1039, 1044-45 (D.N.M. 2004)(Browning, J.)(denying a 56(d) request

where plaintiff did not explain why, during the discovery period that the court allowed, he did

not obtain the discovery sought in his motion).  The Tenth Circuit has summarized rule 56(d)'s

requirements as follows:

> A prerequisite to granting relief pursuant to Rule 56[(d)] is an affidavit furnished
> by the nonmovant.  Although the affidavit need not contain evidentiary facts, it
> must explain why facts precluding summary judgment cannot be presented.  This
> includes identifying the probable facts not available and what steps have been
> taken to obtain these facts.  In this circuit, the nonmovant also must explain[, with
> specificity,] how additional time will enable him to rebut movant's allegations of
> no genuine issue of fact.

Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783 (internal quotations and citations omitted).

See Tadlock v. Lahood, 2013 WL 6284428, at *5 (10th Cir. Dec. 5, 2013)(unpublished)(citing

Price ex rel. Price v. W. Res., Inc. for the requirements of rule 56(d) after the 2010 amendment);

Douglass v. United Auto Workers Local Union 31, 188 Fed. App'x 656, 658 (10th Cir.

2006)(stating that the affidavit must state how the additional time would enable the party to meet

its burden "with specificity").  A rule 56(d) affidavit or declaration must state, with specificity,

what additional discovery is believed necessary.  See Burke v. Utah Transit Auth. and Local 382,

462 F.3d 1253, 1264 (10th Cir. 2006); Chavez v. Perry, 142 Fed. Appx. 325, 334 (10th Cir.

2005)("To resist summary judgment on this basis (56[(d)]), a party must specifically identify

what facts it seeks to discover and show how those facts would materially aid its case on the

dispositive issues."). If a party does not file an affidavit or declaration, a district court does not abuse its discretion in denying discovery. See Tadlock v. Lahood, 2013 WL 6284428, at *5.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economu, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the

plaintiff's claim, even though novel or otherwise unsettled, in fact has merit. Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001).  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1. Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer

mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: When (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation

of state law"; (iv) "qualified immunity is asserted at the pleading stage" and "the precise factual

basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a

risk of bad decisionmaking" because of inadequate briefing; (vi) discussing both elements risks

"bad decisionmaking," because the court is firmly convinced the law is not clearly established

and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the

doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional

question when "it is plain that a constitutional right is not clearly established but far from

obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir.

2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven

circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address

the first prong before the second prong in cases involving a recurring fact pattern, where

guidance on the constitutionality of the challenged conduct is necessary and the conduct is likely

only to face challenges in the qualified immunity context.  Camreta v. Greene, 131 S. Ct. at

2031-32.  See Kerns v. Bader, 663 F.3d at 1181.[13]  "Courts should think carefully before

---

[13] In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was
not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified
immunity test before agreeing" with the plaintiff that the qualified immunity defense did not
protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law)
> question, we reverse without addressing the former (constitutional violation)
> question.  And we pursue this course because doing so allows us to avoid
> rendering a decision on important and contentious questions of constitutional law
> with the attendant needless (entirely avoidable) risk of reaching an improvident
> decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the
plaintiff's constitutional rights, and stated that guidance on the particular constitutional issue
would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that
the scope of the Constitution's protection for a patient's hospital records can be adequately

decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.   A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that
>
>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, exception that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.
>
> 42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violation where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be

- 44 -

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or

statutory interpretation that will 'have no effect on the outcome of the case.'"   Ashcroft v. al-

_____

characterized as being in good faith."   Wood v. Strickland, 420 U.S. 308, 322 (1975).   In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").   It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.   J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).   Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.   See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .   These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level.");  Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).   In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.   See 547 U.S. at 596-97.   Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.   It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.   It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.).

Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)).

See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think

hard again, before turning small cases into large ones.").[14]   The Tenth Circuit will remand a case

---

[14] In Kerns v. Board of Commissioners, 888 F. Supp. 2d 1176 (D.N.M. 2012)(Browning, J.), the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

> While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases. 131 S.Ct. at 2032. As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small." It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment. Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job. The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way. Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts. The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice. The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance. Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

> If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S.Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S.Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S.Ct. 1235 (2012). In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice

to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

##        2.        Clearly Established Rights in the Qualified Immunity Analysis.

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the

---

President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S.Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S.Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S.Ct. at 1241, 1250. The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

888 F. Supp. 2d at 1222 n.35.

jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't Of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). See Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing

violates that right." <u>Ashcroft v. al-Kidd</u>, 131 at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" <u>Reichle v. Howards</u>, 132 S. Ct. at 2093 (quoting <u>Ashcroft v. al-Kidd</u>, 131 S. Ct. at 2083).  While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate." <u>Ashcroft v. al-Kidd</u>, 131 at 2083.  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." <u>Anderson v. Creighton</u>, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established." <u>Ashcroft v. al-Kidd</u>, 131 at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  <u>Saucier v. Katz</u>, 533 U.S. at 205.

        The Tenth Circuit held in <u>Kerns v. Bader</u> that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction <u>might</u> make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  In <u>Kerns v. Bader</u>, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was <u>beyond debate</u> in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See <u>Casey v. City of Fed. Heights</u>, 509 F.3d 1278, 1284

(10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."   Casey v. City of Fed. Heights, 509 F.3d at 1284.   Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."   Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL
## VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through

the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. City of New York City Dept. of Soc. Servs., 436 U.S. 658, 689 (1978)). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

### 1.   Color of State Law.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."  Jojola v. Chavez, 55 F.3d at 493.  Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be

'fairly attributable to the State.'"  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447

(quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state

employment is generally sufficient to render the defendant a state actor . . . . [,]' at the same time,

it is 'well settled that an otherwise private tort is not committed under color of law simply

because the tortfeasor is an employee of the state.'"  Jojola v. Chavez, 55 F.3d at 493 ((quoting

Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d

1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it

constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's

use or misuse of their authority as a public employee, and the violation allegedly committed by

the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus,

however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus

in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily
> identifiable fact, such as the officer's attire, the location of the act, or whether or
> not the officer acts in accordance with his or her duty. Instead one must examine
> "the nature and circumstances of the officer's conduct and the relationship of that
> conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations

omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st. Cir. 1995)).

**2.      Individual Liability.**

Under § 1983, "Defendants are liable for the harm proximately caused by their conduct."

Martinez v. Carson, 697 F.3d at 1255.  Thus, government actors may be liable for the

constitutional violations that another committed, if the actors "set in motion a series of events

that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded: "[A] plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has applied liability for those defendants who proximately caused an injury complained-of under § 1983, and that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995).  "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  Id.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange County Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir.

1987), abrogated on other grounds by <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701 . . . (1989).

<u>Trask v. Franco</u>, 446 F.3d at 1046.  Thus, in the context of a Fourth Amendment claim, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."  <u>Martinez v. Carson</u>, 697 F.3d at 1255.  The Tenth Circuit gave an example of a superseding intervening cause, quoting the Honorable Samuel J. Alito, now-associate Justice for the Supreme Court of the United States, while he was sitting on the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, <u>see</u> Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. <u>See</u> <u>id.</u> § 440.

<u>Trask v. Franco</u>, 446 F.3d at 104 (quoting <u>Bodine v. Warwick</u>, 72 F.3d at 400).  Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility."  <u>Trask v. Franco</u>, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., <u>Prosser and Keeton on Torts</u> § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.    Supervisory Liability.

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "an affirmative link between the constitutional deprivation and either the supervisor's personal participation, [] exercise of control or direction, or [] failure to supervise." Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(internal alterations omitted).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."    Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)(citations omitted)(internal quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 502 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, 2011 WL 7444745, at **25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Aschroft v. Iqbal:

> A plaintiff may [] succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in Bd. of Cnty. Comm'rs v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required

- 57 -

to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotations omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4.   **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its

officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING UNCONSTITUTIONAL IMPRISONMENT

The Tenth Circuit has explained that a plaintiff alleging that the "government has unconstitutionally imprisoned him has at least two potential constitutional claims: 'The initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause.'"  Mondragon v. Thompson, 519 F.3d 1078, 1082 (10th Cir. 2008)(quoting Pierce v. Gilchrist, 359 F.3d 1279, 1285-86 (10th Cir. 2004)).  If the plaintiff was imprisoned without legal process, his Fourth Amendment claim[15] is analogous to false arrest or false imprisonment; if he was imprisoned "pursuant to legal but wrongful process, he has a claim under the procedural component of the Fourteenth Amendment's Due Process Clause analogous to a tort claim for malicious prosecution."  519 F.3d at 1082.  More recently, the Tenth Circuit has explained that the Fourteenth Amendment claim analogous to a malicious prosecution claim would not be available if an adequate state remedy exists, but a plaintiff may have the option of bringing a Fourth Amendment claim using a similar malicious prosecution theory.  See Myers v. Koopman, 738 F.3d 1190, 1192 (10th Cir. 2013).  In Myers v. Koopman, the plaintiff alleged that a detective fabricated facts to create the illusion of probable cause and, as a result, the plaintiff spent three days in custody.  See 738 F.3d at 1192.  The plaintiff brought a claim under § 1983 for malicious

_____

[15] The Tenth Circuit clarified that, because the Fourteenth Amendment incorporates the Fourth Amendment's protections against the states, a Fourth Amendment claim against state actors is also a Fourteenth Amendment claim.  See Mondragon v. Thompson, 519 F.3d at 1082 n.3.  The Court will likewise "avoid this terminology here to reduce confusion," opting instead to refer to the Fourth Amendment in reference to the right to be free from unlawful seizures, and the Fourteenth Amendment in reference to the right to due process.  Mondragon v. Thompson, 519 F.3d at 1082 n.3.

prosecution, alleging that the detective violated his Fourth and Fourteenth Amendment rights. See 738 F.3d at 1192. The plaintiff brought the Fourteenth Amendment malicious prosecution claim based on the detective's conduct in "conjur[ing] up facts to create the illusion of probable cause for an arrest warrant and subsequent prosecution." 738 F.3d at 1193. The Tenth Circuit explained that "[t]he Fourteenth Amendment protects individuals against deprivations of liberty without due process of law. If a state actor's harmful conduct is unauthorized and thus could not be anticipated pre-deprivation, then an adequate post-deprivation remedy -- such as a state tort claim -- will satisfy due process requirements." 738 F.3d at 1193 (citations omitted). Because a malicious prosecution claim under Colorado law was available, the Tenth Circuit affirmed the district court's dismissal: "The existence of the state remedy flattens the Fourteenth Amendment peg on which [the plaintiff] now tries to hang his § 1983 malicious-prosecution claim." 738 F.3d at 1193. The plaintiff also brought a malicious prosecution claim under the Fourth Amendment; the district court analogized the claim to a false imprisonment claim, but the Tenth Circuit said that the plaintiff was correct in casting his claim as malicious prosecution, "because he was seized after the institution of legal process." 738 F.3d at 1194. The Tenth Circuit described the difference between a § 1983 claim for false imprisonment and malicious prosecution under the Fourth Amendment:

> What separates the two claims? -- the institution of legal process. Unreasonable seizures imposed without legal process precipitate Fourth Amendment false imprisonment claims. See Wallace[ v. Kato], 549 U.S. [384,] 389 [(2007)] (concluding that false imprisonment was the proper analogy where defendants did not have a warrant for the plaintiff's arrest and thus detention occurred without legal process). Unreasonable seizures imposed with legal process precipitate Fourth Amendment malicious-prosecution claims. See Heck[ v. Humphrey], 512 U.S. [477,] 484 [(1994)] (where detention occurs with legal process the "common-law cause of action for malicious prosecution provides the closest

analogy"). Like rain and snow, the claims emanate from the same source, but under different conditions.

738 F.3d at 1194 (footnote omitted). The Tenth Circuit explained that the plaintiff was "arrested pursuant to a validly issued -- if not validly supported -- arrest warrant" and that the plaintiff's suit "challenges the probable-cause determination that generated the legal process." 738 F.3d at 1195.

### 1. **Malicious Prosecution.**

The Tenth Circuit "has recognized the viability of malicious prosecution claims under § 1983." Taylor v. Meacham, 82 F.3d 1556, 1560 (10th Cir. 1996). To establish a malicious-prosecution claim under § 1983, a plaintiff must prove that the defendant initiated or continued a proceeding against him without probable cause. See Becker v. Kroll, 494 F.3d 904, 913-14 (10th Cir. 2007). "Unlike a false arrest or false imprisonment claim, malicious prosecution concerns detention only after the institution of legal process." Wilkins v. DeReyes, 528 F.3d 790, 798 (10th Cir. 2008)(internal quotation omitted). "In this context, a Fourth Amendment violation can exist only when a plaintiff alleges the legal process itself to be wrongful." Wilkins v. DeReyes, 528 F.3d at 798.

Under Tenth Circuit case law, a § 1983 malicious prosecution claim includes the following elements: (i) the defendant caused the plaintiff's continued confinement or prosecution; (ii) the original action terminated in favor of the plaintiff; (iii) no probable cause supported the original arrest, continued confinement, or prosecution; (iv) the defendant acted with malice; and (v) the plaintiff sustained damages. See Wilkins v. DeReyes, 528 F.3d at 799. In a Fourth-Amendment malicious-prosecution case, "the third element deals only with the

probable cause determination during the institution of legal process."  Wilkins v. DeReyes, 528

F.3d at 799.

### 2.      False Arrest and Imprisonment.

The Tenth Circuit has explained that a false arrest or imprisonment claim is appropriate

when a person has been imprisoned without legal process.  See Mondragon v. Thompson, 519

F.3d at 1082.  The claim arises under the Fourth Amendment after an unlawful arrest and before

the institution of legal process; the claim accrues when the plaintiff is released or legal process is

instituted to justify the imprisonment.  See Mondragon v. Thompson, 519 F.3d at 1083.  To state

a claim for false arrest, a plaintiff must show two elements:

> First, the plaintiff must prove that the defendant has deprived him of a right
> secured by the "Constitution and laws" of the United States.  Second, the plaintiff
> must show that the defendant deprived him of this constitutional right "under
> color of any statute, ordinance, regulation, custom, or usage, of any State or
> Territory."  This second element requires that the plaintiff show that the defendant
> acted "under color of law."

Smith v. Plati, 258 F.3d 1167, 1175 (10th Cir. 2001)(quoting Adickes v. S.H. Kress & Co., 398

U.S. 144, 150 (1970)).

### 3.      Jailer Liability.

There may be some situations in which a jailer will be held liable for detaining someone

in violation of the person's constitutional rights, but the Tenth Circuit has explained that a

jailer's role is separate from others' roles in the system, such as the magistrate judge or arresting

officer.  In Dry v. United States, tribal police officers arrested the plaintiffs when the plaintiffs

distributed literature on tribal grounds; the three plaintiffs were separated, transported to two

different cities, and detained for two to three hours before they were charged in the tribal court.

See 235 F.3d at 1251.   The plaintiffs asserted causes of action under the United States
Constitution and 42 U.S.C. § 1983 against the jailers who detained them in each city.  See 235
F.3d at 1251-52.  The plaintiffs argued that the jailers were obligated under the United States
Constitution to "(1) question the arresting officers as to their probable cause for arrest, (2) verify
the validity of the grounds for detention under the charging entity's laws, and (3) conduct an
independent constitutional and historical analysis to determine whether the charging entity's
assertion of jurisdiction over the detainee is legitimate."  235 F.3d at 1259.  The Tenth Circuit
rejected these arguments, holding that the jailers did not violate the plaintiffs' constitutional
rights by detaining them for a few hours.  See 235 F.3d at 1259.  The Tenth Circuit agreed with
the district court that, "absent any objectively apparent lack of a basis for a detention which
should arouse suspicion, a jailer cannot be expected to assume the mantle of a magistrate to
determine the probable cause for an arrest," citing decisions from the United States Court of
Appeals for the Ninth and Seventh Circuits to support this conclusion.  235 F.3d at 1259 (internal
quotation marks omitted)(citing Martinez v. City of Los Angeles, 141 F.3d 1373, 1380 (9th
Cir.1998); Wood v. Worachek, 618 F.2d 1225, 1231 (7th Cir.1980)).  In Martinez v. City of Los
Angeles, the Ninth Circuit analyzed a claim for false imprisonment grounded on prolonged
detention under California law, explaining that a jailer "may be liable if the jailer knows that the
imprisonment is unlawful or if there is some notice sufficient to put him, as a reasonable man,
under a duty to investigate the validity of the incarceration."  141 F.3d at 1380 (internal
quotation marks omitted).  In Wood v. Worachek, the Seventh Circuit explained that

> a jailer is liable for the illegal detention of an inmate when he unreasonably
> detains the inmate for arraignment or release, or possesses an affirmative
> knowledge of the illegality of the arrest.  But if the errors upon which liability is

> asserted take place beyond the scope of his responsibility, he cannot be found liable where he has acted reasonably and in good faith.

618 F.2d at 1231.  The Seventh Circuit reversed the district court's conclusion that the jailers violated the plaintiff's Fourth and Fourteenth Amendment rights; although the jailers detained the plaintiff based on an unlawful arrest, the Seventh Circuit determined that the evidence at trial showed that they acted reasonably and in good faith, and "without an affirmative knowledge that the plaintiff's arrest had been unlawful."  618 F.2d at 1231.

A jailer does not have to investigate every claim of innocence, but may rely on a facially valid warrant to detain an individual.  In Scull v. New Mexico, the plaintiff Reed brought causes of action under 42 U.S.C. §§ 1983, 1985, and 1986, and under the New Mexico Tort Claims Act, for unlawfully detaining him for thirty days without initiating extradition proceedings.  See 236 F.3d at 590-91.  Reed was incarcerated in Ohio for ten years; as a condition of his parole, he signed a waiver of extradition, which stated that, if he left Ohio without permission, he would waive extradition proceedings and would return to Ohio voluntarily.  See 236 F.3d at 591-92. When Reed's parole officer told him a year later to report to be arrested, he fled Ohio, stating that he was forced to choose between violating parole, or being beaten or killed at the Ohio correctional facility; Reed was arrested in Taos, New Mexico, and extradition proceedings were initiated.  See 236 F.3d at 592.  He filed a petition for a writ of habeas corpus, which the Honorable Peggy Nelson, then District Judge, Eighth Judicial District for the State of New Mexico, granted, holding that Reed left Ohio under duress and was therefore not a fugitive; Judge Nelson ordered that Reed be released from custody, and the state appealed.  See 236 F.3d at 592.  While the Taos County case was on appeal, Reed was in a minor car accident in

Albuquerque, and police arrested him on the outstanding warrant that, unbeknownst to the police, was the same as the one at issue in the Taos County appeal.  See 236 F.3d at 592.  Reed's attorney on the Taos County appeal contacted the Bernalillo County district attorney's office and demanded that Reed be released, explaining that the matter was pending in Taos County and including a copy of Judge Nelson's order.  See 236 F.3d at 593.  Although Reed and Reed's attorney in the Taos County appeal attempted to get his release based on Judge Nelson's order, Reed remained in the Bernalillo County Detention Center ("BCDC") for thirty days; he sued the BCDC and its director under § 1983 and under the New Mexico Tort Claims Act for false imprisonment, arguing that the BCDC director and the staff intentionally ignored Judge Nelson's order for thirty days, and ignored his requests for an attorney and for a hearing.  See 236 F.3d at 597.

The Tenth Circuit held that qualified immunity protected the BCDC.  See 236 F.3d at 597.  The Tenth Circuit reviewed N.M. Stat. Ann. § 33-3-12(A), which states:

> Every public officer who has power to order the imprisonment of any person for violation of law shall, on making such order, transmit to the sheriff, jail administrator or independent contractor of his respective county a true copy of the order so that the person imprisoned may be considered under his custody until expiration of the commitment or until further steps, as provided by law, are taken to obtain the prisoner's liberty, of which he shall, in due time, notify the sheriff, jail administrator or independent contractor in writing.

N.M. Stat. Ann. § 33-3-12(A).  The Tenth Circuit noted that, while Judge Nelson ordered Reed's release from the Taos County Adult Detention Center, the order did not include in its terms that Reed should be released from the BCDC.  See 236 F.3d at 597.  The Tenth Circuit stated: "Given the terms of Judge Nelson's order, we fail to see how Mr. Reed had either a constitutional or statutory right to be released from the BCDC."  236 F.3d at 597.  In response to Reed's

arguments that the BCDC should have investigated the matter after learning about Judge

Nelson's order, the Tenth Circuit said:

> While we do not endorse the BCDC Appellees' failure to pursue the matter -- a simple phone call might have expedited resolution of Mr. Reed's case -- we conclude that the BCDC Appellees were not required by either the Constitution or statute to investigate independently Mr. Reed's claim that he should be released within this time frame.  See Thompson v. Duke, 882 F.2d 1180, 1186 (7th Cir. 1989)("On the basis of [Baker v. McCollan, 443 U.S. 137 . . . (1979)], Hardiman and Patrick, as mere jailers, only had a duty to determine the facial validity of the warrant under which [defendant] was held; they had no independent duty to investigate [defendant's] claims of innocence."); see also Baker, 443 U.S. at 145-46 . . . (1979)("[W]e do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.  Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim.").

236 F.3d at 598 (brackets in original).  The Tenth Circuit affirmed the district court's decision to

grant the BCDC defendants summary judgment based on qualified immunity.  See 236 F.3d at

598.

**NEW MEXICO LAW REGARDING FALSE ARREST AND FALSE IMPRISONMENT**

"Under New Mexico law, 'false imprisonment consists of intentionally confining or

restraining another person without his consent and with knowledge that he has no lawful

authority to do so.'"  Romero v. Sanchez, 119 N.M. 690, 895 P.2d 212, 215 (1995)(quoting

NMSA 1978, § 30-4-3).  False arrest or unlawful detention occurs when the "facts available to

[a] detaining officer would [not] warrant [a] person of reasonable caution to believe detention

appropriate."  Romero v. Sanchez, 895 P.2d at 215 (stating that "[u]nlawful detention has similar

requirements" to false imprisonment).  While the Supreme Court of New Mexico appears to

recognize them as separate torts, the Court of Appeals of New Mexico more recently has found

that "[a] false arrest is merely one way of committing false imprisonment." Santillo v. N.M.

Dep't of Pub. Safety, 143 N.M. 84, 88, 173 P.3d 6, 11 (Ct. App. 2007)(citing 32 Am. Jur. 2d

False Imprisonment § 3 (2007)). See Wallace v. Kato, 549 U.S. 384, 388-89 (2007)("False

arrest and false imprisonment overlap; the former is a species of the latter."); Butler ex rel. Butler

v. Rio Rancho Pub. Sch. Bd. of Educ., 245 F. Supp. 2d 1203, 1211 (D.N.M. 2002)("The torts of

false arrest and false imprisonment are similar."); D. Dobbs, The Law of Torts § 36, at 67

(2000)("False arrest is a term that describes the setting for false imprisonment when it is

committed by an officer or by one who claims the power to make an arrest.").

The New Mexico courts have not stated when a plaintiff's causes of action for false arrest

and for false imprisonment accrue. The New Mexico courts, however, often look to the law as

stated in the Restatement (Second) of Torts. See Montanez v. Cass, 89 N.M. 32, 38, 546 P.2d

1189, 1195 (Ct. App. 1975)("It has long been the policy of our courts to follow in the footsteps

of the Restatement of Torts, 2d."). In Schmitz v. Smentowski, 109 N.M. 386, 785 P.2d 726

(1990), the Supreme Court of New Mexico stated: "We have also been very willing to adopt the

view of the Restatement of Torts to assist our development of new tort areas." 109 N.M. at 393,

785 P.2d at 736. The Supreme Court of New Mexico explained:

> Accordingly, New Mexico has recognized as tortious inducing a breach of
> contract, adopting the view promulgated in Restatement of Torts § 766 (1939).
> Wolf v. Perry, 65 N.M. 457, 461, 339 P.2d 679, 681 (1959)(requiring that "one
> who, without justification or privilege to do so, induces a third person not to
> perform a contract with another, is liable to the other for the harm caused
> thereby"); see also Williams v. Ashcraft, 72 N.M. 120, 381 P.2d 55
> (1963)(recognizing the tort of wrongful interference with another's business
> relations). We have adopted the cause of action of intentional interference with
> prospective contractual relations, relying on the tort as articulated in Restatement
> (Second) of Torts § 766(B) (1977). M & M Rental Tools, Inc. v. Milchem, Inc.,
> 94 N.M. 449, 452-54, 612 P.2d 241, 244-46 (Ct. App. 1980)(one who, with "bad
> motive," intentionally interferes with another's prospective contractual relations,

is subject to liability); Anderson v. Dairyland Ins. Co., 97 N.M. 155, 158-59, 637 P.2d 837, 840-41 (1981). These torts reflect the underlying theory of prima facie tort as applied to contractual relations -- the underlying malicious motive of a defendant's actions, done without justification, makes an otherwise lawful act, competition, tortious.

New Mexico has also recognized the tort of intentional infliction of emotional distress, relying on Restatement (Second) of Torts § 46 (1965), Mantz v. Follingstad, 84 N.M. 473, 479-80, 505 P.2d 68, 74-75 (Ct. App. 1972); Ramirez v. Armstrong, 100 N.M. 538, 673 P.2d 822 (1983), and we have recognized that the intentional and wrongful deprivation of the right to vote or hold public office creates tort liability. Valdez v. Gonzalez, 50 N.M. 281, 176 P.2d 173 (1946).

Schmitz v. Smentowski, 109 N.M. at 393, 785 P.2d at 736. See Baldonado v. El Paso Natural Gas Co., 143 N.M. 288, 294, 176 P.3d 277, 283 (2007)(adopting the elements of intentional infliction of emotional distress from Restatement (Second) of Torts § 46); Berlangieri v. Running Elk Corp., 134 N.M. 341, 347, 76 P.3d 1098, 1104 (2003)("The rule [for acceptance of risk] followed by the courts of this state thus far tracks the rule followed in a majority of other courts, as well as the Restatement (Second) of Torts § 496B (1965)."). The Supreme Court of New Mexico, however, has also stated that "the Restatement is merely persuasive authority entitled to great weight that is not binding on this Court." Gabaldon v. Erisa Montg. Co., 128 N.M. 84, 90, 990 P.2d 197, 204 (1999). See Blake v. Public Serv. Co, 134 N.M. 789, 82 P.3d 960 (Ct. App. 2003)(noting that New Mexico courts have not adopted Restatement (Second) of Torts § 324A, Liability to Third Person for Negligent Performance of Undertaking, declining to decide whether to do so).

"For false imprisonment, the statute [of limitations] begins to run only when the imprisonment ends, since the period of imprisonment is treated as a unit." Restatement (Second) of Torts § 899, cmt. c (1979). See Wallace v. Kato, 549 U.S. at 389 ("The running of the statute

of limitations on [common-law] false imprisonment is subject to a distinctive rule -- dictated, perhaps, by the reality that the victim may not be able to sue while he is still imprisoned.").  The Restatement (Second) of Torts does not state when an action for false arrest accrues.  The Restatement, however, appears to treat false arrest as a part of false imprisonment.  See Restatement (Second) of Torts Index at 530 ("False Arrest: See False Imprisonment").  According to the Restatement (Second) of Torts: "If there is nothing more than the false arrest and the accused is released without any further proceeding, his remedy is an action for false imprisonment."  Restatement (Second) of Torts § 654.

Other courts have taken different approaches to when common-law claims of false arrest and false imprisonment accrue and the statute of limitations begins to run.  There appear to be three different times from which courts have found the statute of limitations begins to run: (i) at the time of arrest, see Wallace v. City of Chicago, 471 F. Supp. 2d 894, 898 (N.D. Ill. 2004)(applying Illinois law, and holding that the statute of limitations on a false imprisonment claim begins to run at the time false imprisonment begins);Leatherwood v. Key West, 347 So.2d 441, 442 (Fla. App. 1977) ("The cause of action for false arrest and imprisonment accrued on the day of plaintiff's arrest . . . ."), cert. denied, 358 So.2d 131 (Fla. 1978); Brooks v. Pennington, 995 So.2d 733, 737 (Miss. Ct. App. 2007)(stating that "a complaint for false arrest and false imprisonment accrues on the date of arrest."); (ii) at the time of arraignment or when legal process is initiated, see Johnson v. Blackwell, 885 N.E.2d 25, 31 (Ind. Ct. App. 2008)(holding that "Johnson's cause of action for false imprisonment/false arrest accrued when he was bound over for trial in March 2003," and not when he was arrested in February 2003 or when he was released in 2006); Dunn v. Felty, 226 S.W.3d 68, 72 (Ky. 2007)(holding that the false

imprisonment ended when the plaintiff began being held pursuant to legal process -- the date when he was arraigned on the charges -- because, based on the elements of false imprisonment, he had a complete cause of action at that point); and (iii) at the time of termination of the false or illegal imprisonment, see Hoffman v. County of Delaware, 41 F. Supp. 2d 195, 216 (N.D.N.Y. 1999)("Under New York law, false arrest and false imprisonment claims accrue on the date of the release from confinement."), aff'd 205 F.3d 1323 (2d Cir. 2000); Adler v. Beverly Hills Hosp., 594 S.W.2d 153, 154 (Tex. Civ. App. Dallas 1980)("We hold that false imprisonment is a continuing tort and that the cause of action for the entire period of imprisonment accrues when the detention ends.");  Stafford v. Muster, 582 S.W.2d 670, 680 (Mo. 1979)(stating that, for "false imprisonment in particular, the authorities overwhelmingly hold that a cause of action for false imprisonment accrues on the discharge from imprisonment"); Belflower v. Blackshere, 1955 O.K. 74, 281 P.2d 423, 425 (Okla. 1955)(holding that a cause of action for illegal arrest and false imprisonment accrued at the time plaintiff was released from his alleged illegal restraint and not when the proceedings by which his arrest occurred terminated).

In Wallace v. Kato, Wallace filed suit under 42 U.S.C. § 1983 seeking damages for an unlawful arrest and the Supreme Court, in the majority opinion written by the Honorable Antonin Scalia, Associate Justice for the Supreme Court, decided whether his suit was timely. See 549 U.S. at 386.  Justice Scalia noted that "[a]spects of § 1983 which are not governed by reference to state law are governed by federal rules conforming in general to common-law tort principles."  549 U.S. at 388.  Justice Scalia addressed the accrual of common-law false arrest and false imprisonment claims, and concluded that "[f]alse arrest and false imprisonment overlap; the former is a species of the latter . . . " and that he would "refer to the two torts

together as false imprisonment." 549 U.S. at 389. He noted that "[t]he sort of unlawful detention remediable by the tort of false imprisonment is detention without legal process," and that "[l]imitations begin to run against an action for false imprisonment when the alleged false imprisonment ends." 549 U.S. at 389. "Reflective of the fact that false imprisonment consists of detention without legal process, false imprisonment ends once the victim becomes held pursuant to such process -- when, for example, he is bound over by a magistrate or arraigned on charges."

Id. In a footnote, Justice Scalia noted:

> This is not to say, of course, that petitioner could not have filed suit immediately upon his false arrest. While the statute of limitations did not begin to run until petitioner became detained pursuant to legal process, he was injured and suffered damages at the moment of his arrest, and was entitled to bring suit at that time. See Adler v. Beverly Hills Hospital, 594 S.W.2d 153, 156 (Tex. Civ. App. 1980)("We may concede that a person falsely imprisoned has the right to sue on the first day for his detention").

549 U.S. at 390 n.3.

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Federal courts "possess only that power authorized by [the] Constitution and statute . . . ." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction. See 28 U.S.C. §§ 1331-32.

1.    **Supplemental Jurisdiction.**

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."   Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552.  The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines -- pendent and ancillary jurisdiction.[16]  Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact."  United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).  Ancillary jurisdiction gives federal courts the flexibility to "entertain[] a non-federal, non-diversity claim asserted by a party other than the plaintiff, usually in a diversity of citizenship case," although occasionally in admiralty cases as well.  13 C. Wright & A. Miller, Federal Practice & Procedure § 3523, at 173 & n.45. (3d ed. 2008).

In 1988, Chief Justice William H. Rehnquist created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  _See_ James v. Chavez, No. CIV 09-0540 JB/CG, 2011 WL 6013547, at * 5 (D.N.M. November 21, 2011)(Browning, J.)(citing 16 Moore's Federal Practice § 106.04[5], at 106-22 (Matthew Bender 3d ed. 2013)).  In response to the Committee's findings regarding pendent and ancillary jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

---

[16] The Tenth Circuit has noted that Congress' intent in passing 28 U.S.C. § 1367 was to supersede the common-law doctrine of pendent jurisdiction: "Effective December 1, 1990, Congress enacted legislation, codified at 28 U.S.C. § 1367 (1976 & Supp. 1992), which supersedes the common law pendent jurisdiction doctrine."  Baker v. Bd. of Regents of State of Kan., 991 F.2d 628, 634 (10th Cir. 1993)(citing Whalen v. Carter, 954 F.2d 1087, 1097 (5th Cir. 1992), and Aschinger v. Columbus Showcase Co., 934 F.2d 1402 (6th Cir. 1991)).

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

      2.    **District Court Discretion.**

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction.  383 U.S. at 726.  Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

     (1)    the claim raises a novel or complex issue of State law,

     (2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

       (3)      the district court has dismissed all claims over which it has original jurisdiction, or

       (4)      in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).   In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity . . . ."   Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir.1998)("[S]ection 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994) ("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Executive Software N. Am. v. U.S. Dist. Court, 24 F. 3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087 (9th Cir. 2008); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c) . . . .")(emphasis in original); Bonadeo v. Lujan, No. CIV 08–0812 JB/ACT, 2009 WL 1324119, at *8 (D.N.M. April 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining

jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists.").  At least one other

district court in the Tenth Circuit besides this Court has reached the same conclusion.  <u>See</u>

<u>Gudenkauf v. Stauffer Commc'ns, Inc.</u>, 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow,

J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot

occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should generally decline jurisdiction over

state claims when federal claims no longer remain: "When all federal claims have been

dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining

state claims." <u>Koch v. City of Del City</u>, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting <u>Smith v.</u>

<u>City of Enid ex rel. Enid City Comm'n</u>, 149 F.3d 1151, 1156 (10th Cir. 1998)).  The Supreme

Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and
> to promote justice between the parties, by procuring for them a surer-footed
> reading of applicable law.  Certainly, if the federal claims are dismissed before
> trial, even though not insubstantial in a jurisdictional sense, the state claims
> should be dismissed as well.

<u>United Mine Workers of Amer. v. Gibbs</u>, 383 U.S. at 726.  The Court has previously stated that a

district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C.

§ 1367(c) applies.  <u>See</u> <u>Armijo v. New Mexico</u>, No. CIV 08-0336, 2009 WL 3672828, at *4

(D.N.M. September 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not

only acknowledged such a result, they have encouraged it.").  The Tenth Circuit has recognized

that a district court does not "abuse [its] discretion" when it declines to exercise supplemental

jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims

over which it has original jurisdiction[.]'" Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).

## ANALYSIS

The Court will grant the Defendants' MSJ in part and deny it in part.  Rustin is entitled to qualified immunity, because he did not violate Chavez' constitutional rights through his own actions nor through instituting the MDC policy.  Chavez' municipal liability claims also fail, because he has not established that his constitutional rights were violated, and without a constitutional violation, there cannot be municipal liability.  The Court will dismiss with prejudice Chavez' federal claims against the Defendants; the Court will decline to exercise supplemental jurisdiction and will thus remand the remaining state law claims to the Second Judicial District Court of New Mexico.

## I.  RUSTIN IS ENTITLED TO QUALIFIED IMMUNITY.

Although the Complaint does not make this entirely clear, Chavez has brought a § 1983 claim against the Defendants under the Fourth Amendment; he has alleged that the Defendants falsely arrested, falsely imprisoned, and illegally detained him.  He asserts that his initial arrest and detention were illegal, because before he was arrested, Judge Flores cancelled the bench warrant that served as the basis of his arrest; he further asserts that he gave the Defendants notice of that fact, yet they continued to detain him an additional two days.  The Defendants move for summary judgment, asserting that Rustin is entitled to qualified immunity and that Chavez failed to plead sufficient facts to invoke municipal liability; the Defendants contend that they did not violate Chavez' constitutional rights.  Although these issues come before the Court on summary judgment, the Court reviews the defense of qualified immunity "somewhat differently" than

other summary judgment rulings.  Scull v. New Mexico, 236 F.3d at 595.  Chavez must satisfy a two-part test: first, he must show that the Defendants' conduct violated a constitutional or statutory right, and second, he must demonstrate that the constitution or statutory right was clearly established at the time.  See Scull v. New Mexico, 236 F.3d at 595.  "Only if the plaintiff establishes both elements of the test does the defendant bear the traditional burden of showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law."  Scull v. New Mexico, 236 F.3d at 595 (internal quotation marks and citations omitted).[17]

There are a few issues the Court will address at the outset.  First, although Chavez has

---

[17] Although the Court will analyze both prongs of the qualified immunity analysis, it recognizes that the Supreme Court and the Tenth Circuit have stated that district courts should proceed directly to the clearly established prong in seven circumstances, and the Court must follow that guidance faithfully and fully.  See Pearson v. Callahan, 555 U.S. at 236-42.  The Court acknowledges that several of the circumstances may apply here, including, for example, (i) deciding the constitutional question may require an uncertain interpretation of state law, because it is not immediately apparent what a jailer's duties are under New Mexico law; and (ii) it is not obvious whether Chavez has the constitutional right he is asserting, leading the Court to think that the law was not clearly established.  Other circumstances, however, indicate that the Court may "avoid avoidance" and address the first prong, because, for example, jailers would benefit from constitutional guidance.  The parties in this case focused almost exclusively on whether Chavez met the first prong of the qualified immunity analysis.  Most importantly, the Court notes that its analysis whether the law is clearly established depends greatly on how the constitutional right is framed and understood, and by addressing the first prong of the qualified immunity analysis first, the Court has been better able to accurately describe the constitutional right and whether the relevant cases clearly establish that right.  While the Court should be careful not to reach issues that the Supreme Court or Tenth Circuit want the Court to avoid, it is difficult here to intelligently do the clearly established analysis without studying the violation prong fully and focusing on what the right is.  Because the Tenth Circuit has emphasized that the "clearly established" analysis may turn on a "distinction," it is important to flesh out any distinctions, and doing the first prong helps mightily disclose those distinctions.  Kerns v. Bader, 663 F.3d at 1188 (stating that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." (emphasis in original))

requested further discovery related to the qualified immunity claim, the Court does not see further discovery as proper in this case.  The Court permitted limited discovery focused on the qualified immunity defense and instructed Chavez that, if he could not resolve discovery issues with the Defendants, that he could submit to the Court a rule 56(d) affidavit and explain his need for further discovery.  He did not submit a rule 56(d) affidavit or declaration.  More importantly, many of the areas of discovery that Chavez has requested have been disclosed through the Defendants' exhibits attached to the MSJ and Reply, including the relevant MDC policies and the bench warrant on which Chavez was arrested; other areas of discovery involve legal rather than factual issues, such as the bases for which a jailer may release a prisoner; and certain areas of requested discovery do not need factual development, because the Defendants do not dispute Chavez' assertions, including that Rustin instituted and approved the MDC policies.  The Court therefore will deny Chavez' requests for further discovery and will consider the matter on the present record.  See .").  If a party does not file an affidavit or declaration, a district court does not abuse its discretion in denying discovery.  See Tadlock v. Lahood, 2013 WL 6284428, at *5 (holding that a district court did not abuse its discretion in denying discovery request, because the party "did not comply with Rule 56(d) by submitting an affidavit explaining his need for discovery").

Second, although Chavez lists only the Fourth Amendment in his Complaint, he also invokes the Fourteenth Amendment's protections in his Response; the Court must determine whether his claims fit under one or both of these constitutional provisions.  The Tenth Circuit has explained that "[t]he initial seizure is governed by the Fourth Amendment, Albright v. Oliver, 510 U.S. 266 . . . (1994), but at some point after arrest, and certainly by the time of trial,

constitutional analysis shifts to the Due Process Clause." Pierce v. Gilchrist, 359 F.3d at 1285-86 (footnote omitted).  The Tenth Circuit has not explained exactly when this transition takes place: "In Pierce, we did not decide what kind of legal process caused the Fourth Amendment claim to end and the Due Process claim to begin, though we suggested that being held for seven weeks and then 'exonerated before trial,' raised only Fourth Amendment issues, not due process issues." Mondragon v. Thompson, 519 F.3d at 1084 n.6 (citations omitted).  The Tenth Circuit in Mondragon v. Thompson explained that, if the plaintiff "never received legal process justifying his imprisonment, then he has a straightforward claim under the Fourth Amendment for his entire time in jail."  519 F.3d at 1083.  As the Court understands Chavez' arguments, Chavez is making a "straightforward claim under the Fourth Amendment for his entire time in jail"; Chavez emphasizes that the bench warrant was not valid at the time he was arrested, and this lack of validity undercuts legal process for his arrest.  Further, there were no events that subsequently took place that would have justified his imprisonment.  The Court will consider Chavez' claims under the Fourth Amendment, because he argues that he never received legal process justifying his imprisonment.

Third, the Court must determine whether Chavez was imprisoned with or without legal process, because that determination decides whether his Fourth Amendment claims fall under a malicious prosecution, or false arrest and false imprisonment, theory.  See Mondragon v. Thompson, 519 F.3d at 1082.  In one sense, he was imprisoned with legal process, because the APD arrested him on a bench warrant -- "[a]t common law, the issuance of an arrest warrant represents a classic example of the institution of legal process."  Wilkins v. DeReyes, 528 F.3d 790, 799 (10th Cir. 2008).  The parties agree that the bench warrant for Chavez' arrest was valid

when it was initially entered; had it remained valid, the Court would have no difficulty concluding that Chavez was imprisoned with legal process.  The problem is that the parties also agree that the bench warrant, although perhaps facially valid, was not legally valid when the APD arrested Chavez, because Judge Flores had cancelled the warrant on January 28, 2011.  The Tenth Circuit most recently explained the legal-process distinction in Myers v. Koopman; In that case and in Wilkins v. DeReyes, the arrest warrants were based on fabricated facts and evidence in the affidavits supporting probable cause.  See Myers v. Koopman, 738 F.3d at 1194-95.  Analyzing the legal-process distinction, the Tenth Circuit said that the plaintiffs in the two cases properly brought their claims pursuant to malicious prosecution theories.  See Myers v. Koopman, 738 F.3d at 1195.  "[H]ere, as in Wilkins, detention occurred after the institution of legal process.  Myers was arrested pursuant to a validly issued -- if not validly supported -- arrest warrant."  Myers v. Koopman, 738 F.3d at 1195.  The Tenth Circuit explained that the plaintiff was challenging the "probable-cause determination that generated the legal process," and that link connected the malicious prosecution cause of action and the Fourth Amendment allegations.  Myers v. Koopman, 738 F.3d at 1195.  In this case, the warrant was validly issued, like the warrants in Myers v. Koopman and Wilkins v. DeReyes, but by the time the APD arrested Chavez, the warrant had already been cancelled and was no longer valid, unlike the facts in Myers v. Koopman and Wilkins v. DeReyes, in which the warrants remained outstanding even if the basis for them was questionable.  In the context of the limitations period for false arrest and imprisonment versus malicious prosecution, the Court has previously discussed the legal process distinction:

> But in Wallace v. Kato, 549 U.S. 384 . . . (2007), the Supreme Court of the United
> States clarified and refined when the limitations period begins to run on a § 1983

claim for false arrest and false imprisonment.  It held that the two torts may both be referred to as a "detention *without legal process*."  Id. at 1095 (emphasis in original).  The limitations period on such a claim begins to run "when the alleged false imprisonment ends," which occurs when "the victim becomes held *pursuant to [legal] process* -- when, for example, he is bound over by a magistrate or arraigned on charges."  Id. at 1096 (emphasis in original).  "[A]fter [the institution of legal process], unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process."  Id. (emphasis in original).

McDow v. Gonzales, No. CIV 07-01266 JB/WPL, 2008 WL 4820786, at *10 (D.N.M. June 23, 2008)(Browning, J.)(alterations and emphasis in original).  Chavez alleged in his Complaint theories of false arrest, false imprisonment, and illegal detention; although he may have been asserting those as torts under state law, if he is asserting a federal claim, the Court thinks the false arrest and false imprisonment theories fit Chavez' concerns better than malicious prosecution under his Fourth Amendment claim, because his main arguments rest on the lack of legal process, namely, a valid warrant.  He has focused his arguments on the lack of a valid warrant, both at his initial arrest and incarceration and then again when Mr. Pistone informed the Defendants that the bench warrant had been cancelled, and has couched his arguments in language of false arrest and false imprisonment.  He has not complained that Judge Flores did not have authority to issue the bench warrant after he failed to appear at a plea hearing, but rather, asserts that, once Judge Flores cancelled the bench warrant, it could not serve as the basis for a lawful arrest.  The Court will also consider Chavez' Fourth Amendment allegations under false arrest and false imprisonment theories.

A.    THE DEFENDANTS DID NOT PARTICIPATE IN CHAVEZ' INITIAL SEIZURE, AND THE DEFENDANTS DID NOT VIOLATE CHAVEZ' FOURTH AMENDMENT RIGHTS WHEN THEY INITIALLY INCARCERATED HIM.

The undisputed facts show that, when the APD arrested Chavez on February 5, 2011, the bench warrant on which they relied was invalid, because Judge Flores cancelled the warrant on January 28, 2011.  Chavez does not name as a defendant the APD officers who arrested him, nor does he name whoever may be responsible for the warrant improperly remaining on the APD's system; he focuses instead on the Defendants' role in accepting Chavez into the MDC, arguing that the act of booking him into the MDC completed the initial arrest.  Chavez' position is essentially that the MDC employees should have ensured that the bench warrant was valid when they accepted him into the MDC, and that their failure to investigate amounts to a false arrest or false imprisonment.[18]

In Dry v. United States, the Tenth Circuit explained that, "absent any objectively apparent lack of a basis for a detention which should arouse suspicion, a jailer cannot be expected to assume the mantle of a magistrate to determine the probable cause for an arrest." 235 F.3d at 1259 (internal quotation marks omitted)(citing Martinez v. City of Los Angeles, 141 F.3d 1373, 1380 (9th Cir. 1998); Wood v. Worachek, 618 F.2d 1225, 1231 (7th Cir. 1980)).  The two cases that the Tenth Circuit cited further explore this standard: in Martinez v. City of Los Angeles, the Ninth Circuit analyzed a claim for false imprisonment grounded on prolonged

_____

[18] The false imprisonment and false arrest are grouped together under the Fourth Amendment analysis when a person is detained without legal process.  See Mondragon v. Thompson, 519 F.3d at 1082 ("If [a plaintiff] has been imprisoned without legal process he has a claim under the Fourth Amendment analogous to a tort claim for false arrest or false imprisonment.");  Wallace v. Kato, 549 U.S. 384, 388-89 (2007)("False arrest and false imprisonment overlap; the former is a species of the latter.").

detention under California law, explaining that a jailer "may be liable if the jailer knows that the imprisonment is unlawful or if there is some notice sufficient to put him, as a reasonable man, under a duty to investigate the validity of the incarceration."   141 F.3d at 1380 (internal quotation marks omitted).  In Wood v. Worachek, the Seventh Circuit explained that

> a jailer is liable for the illegal detention of an inmate when he unreasonably detains the inmate for arraignment or release, or possesses an affirmative knowledge of the illegality of the arrest.  But if the errors upon which liability is asserted take place beyond the scope of his responsibility, he cannot be found liable where he has acted reasonably and in good faith.

618 F.2d at 1231.  The Seventh Circuit reversed the district court's conclusion that the jailers violated the plaintiff's Fourth and Fourteenth Amendment rights; although the jailers detained the plaintiff based on an unlawful arrest, the Seventh Circuit determined that the evidence at trial -- rather than on summary judgment -- showed that they acted reasonably and in good faith, and "without an affirmative knowledge that the plaintiff's arrest had been unlawful."  618 F.2d at 1231.   The Tenth Circuit stated in Scull v. New Mexico that jailers are not required to independently investigate a prisoner's arguments that he is unlawfully detained, relying on cases that indicate jailers have a duty only to determine the facial validity of a warrant, but do not have an independent duty to investigate claims of innocence.  See 236 F.3d at 598.

Although it is unfortunate that the warrant was invalid, Chavez has not shown any indicators from the bench warrant itself that should have aroused a jailer's suspicion or show that the warrant was not facially valid.  The errors in this case -- namely that Judge Flores cancelled the bench warrant, yet it remained available to the APD -- took place beyond the scope of the MDC employees' responsibilities; although Chavez argues that the State Docket, which was available to the public, revealed this error, there was nothing that the MDC employees would

have seen in booking Chavez to make them question the facially valid warrant or see the need to look beyond it.  The MDC employees did not violate Chavez' Fourth Amendment right to be free from an unlawful seizure when they initially booked him into the MDC; Chavez has failed to carry his burden on the initial arrest and incarceration to show that the Defendants violated his constitutional rights.

**B.    THE DEFENDANTS DID NOT VIOLATE CHAVEZ' CONSTITUTIONAL RIGHTS BY CONTINUING TO DETAIN HIM AFTER MR. PISTONE SENT INFORMATION REGARDING THE STIPULATED ORDER TO CANCEL THE BENCH WARRANT.**

Although Chavez argues that his initial incarceration was wrongful, the gravamen of his argument focuses on what happened after he gave the Defendants notice that his bench warrant had been cancelled -- that he remained in custody an additional two days, in his view without any basis, until he obtained a judge's order of release.  He takes issue with the MDC policies which held him there, which Rustin implemented and approved, and argues that the MDC employees' demands for an additional court order violated his constitutional rights.

As an initial note, the Court recognizes that there is some potentially confusing language regarding whether a plaintiff can challenge continued incarceration under the Fourth Amendment.  The Fifth Circuit has held that the "protections offered by the Fourth Amendment do not apply if the plaintiff challenges only continued incarceration," and that "Fourth Amendment claims are appropriate only when the complaint contests the method or basis of the arrest and seizure of the person."  Jones v. City of Jackson, 203 F.3d 875, 880 (5th Cir. 2000)(alteration omitted)(internal quotation marks and citations omitted).  In Wilkins v.

- 84 -

DeReyes, the Tenth Circuit relied on the Fifth Circuit's holding in the context of a malicious

prosecution claim under the Fourth Amendment:

> Unlike a false arrest or false imprisonment claim, malicious prosecution concerns detention only "[a]fter the institution of legal process."  Mondragon v. Thompson, 519 F.3d 1078, 1083 (10th Cir. 2008); see also Wallace v. Kato, 549 U.S. 384 . . . (2007)("[A]fter [institution of legal process], unlawful detention forms part of the damages for the . . . tort of malicious prosecution, which remedies detention accompanied not by absence of legal process, but by wrongful institution of legal process.").  In this context, a Fourth Amendment violation can exist only when a plaintiff alleges the legal process itself to be wrongful.  If a plaintiff challenges merely the confinement after the institution of legal process, but not the process itself, "[t]he protections offered by the Fourth Amendment do not apply."  Jones v. City of Jackson, 203 F.3d 875, 880 (5th Cir. 2000); see also Taylor v. Waters, 81 F.3d 429, 436 (4th Cir. 1996)("[D]etermination of probable cause by detached judicial officer that complies with Fourth Amendment constitutes all of the process due in order to constitutionally detain an accused pending trial.")(citing Baker v. McCollan, 443 U.S. 137, 142-46 . . . (1979)).

Wilkins v. DeReyes, 528 F.3d at 798 (alteration in original).  In Pierce v. Gilchrist, another

Tenth Circuit malicious prosecution case, the defendant argued that the plaintiff was "foreclosed

from bringing Fourth Amendment challenges to his continued confinement."  359 F.3d at 1296

n.11.  The Tenth Circuit did not address the argument directly, but noted that the plaintiff had

also alleged Fourteenth Amendment violations.  See 359 F.3d at 1296 n.11.  Although at first

glance, these Tenth Circuit cases may make it seem as though Chavez is barred from asserting a

Fourth Amendment claim against the Defendants for his continued incarceration, these cases bar

a Fourth Amendment claim based on malicious prosecution, but they say nothing about a false

arrest or false imprisonment theory.  The difference between a malicious prosecution theory and

false arrest or false imprisonment theory under the Fourth Amendment makes the difference --

the former exists when the plaintiff was imprisoned pursuant to legal process, the latter when

there is a lack of legal process.  The Tenth Circuit in <u>Wilkins v. DeReyes</u> cited <u>Taylor v. Waters</u>,

a Fourth Circuit case that explains why legal process makes a difference:

> The Supreme Court, however, has made plain that "[t]he Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases, including the detention of suspects pending trial."  <u>Gerstein</u>, 420 U.S. at 125 n. 27 . . . ; <u>see</u> <u>Baker v.</u> <u>McCollan</u>, 443 U.S. 137, 142-46 . . . (1979)(holding that determination of probable cause by detached judicial officer that complies with Fourth Amendment constitutes all of the process due in order to constitutionally detain an accused pending trial).

<u>Taylor v. Waters</u>, 81 F.3d at 435-36 (brackets in original).  When a plaintiff brings a claim based

on malicious prosecution, the plaintiff is challenging the legal process that existed, meaning that

the plaintiff has the opportunity to challenge the determination of probable cause and whether the

plaintiff should have been arrested in the first place, and if that challenge fails, the plaintiff has

received the protection the Constitution demands from the detached judicial officer evaluating

probable cause in the warrant or other legal process given.  When a plaintiff brings a claim based

on false arrest or false imprisonment, there is no legal process to challenge, and so allowing a

false imprisonment claim under the Fourth Amendment for continued incarceration would

protect the plaintiff's ability to have a detached judicial officer review the reason for his

imprisonment.  Because the Court understands Chavez' claims to fall under a false imprisonment

theory, the Court will consider his challenges to the continued incarceration.

  To maintain a false arrest or false imprisonment claim under § 1983, "plaintiffs must

demonstrate the elements of a common law claim and show that their Fourth Amendment right

to be free from unreasonable search and seizure has been violated."  <u>Trimble v. Park Cnty. Bd. of</u>

<u>Comm'rs</u>, 242 F.3d 390, 2000 WL 1773239, at *3 (10th Cir. 2000)(table decision)(citing <u>Taylor</u>

v. Meacham, 82 F.3d 1556, 1561 (10th Cir. 1996)).  Although a constitutional tort is not based

on any specific state's tort law, "courts have used the common law of torts as a 'starting point'

for determining the contours of constitutional violations under § 1983."  Pierce v. Gilchrist, 359

F.3d at 1286.    See McCormick v. Farrar, 147 F. App'x 716, 721 (10th Cir.

2005)(unpublished)(explaining that courts use the common-law elements of torts as the starting

point for § 1983 constitutional tort claims; although the "'common law' is not limited to the

formulation provided by the state in which the tort occurred," the Tenth Circuit said it has

"considered the state law formulation" of false arrest and false imprisonment).   Under New

Mexico law, false imprisonment is "intentionally confining or restraining another person without

his consent and with knowledge that he has no lawful authority to do so."  Fuerschbach v. Sw.

Airlines Co., 439 F.3d 1197, 1207 (10th Cir. 2006)(quoting Romero v. Sanchez, 895 F.2d at

215).  "False arrest or unlawful detention occurs when the 'facts available to [a] detaining officer

would [not] warrant [a] person of reasonable caution to believe detention appropriate.'"

Fuerschbach v. Sw. Airlines Co., 439 F.3d at 1207 (quoting Romero v. Sanchez, 895 F.2d at

215).

> New Mexico has applied different standards in criminal false imprisonment cases
> and civil false imprisonment cases.  Compare Stout, 613 P.2d at 1039 (applying in
> civil case the standard "that good faith and reasonable *belief* in the lawfulness of
> the action taken are defenses to a false arrest claim") with State v. Barrera, 132
> N.M. 707, 54 P.3d 548, 550 (2002)(requiring as an element in criminal case that
> defendant have "*knowledge* that he has no lawful authority to" intentionally
> confine or restrain the victim)(emphasis added).   Yet, both the New Mexico
> courts and this court have applied the criminal standard in civil cases.  See, e.g.,
> Romero, 895 P.2d at 215-16 (relying on the criminal statute and holdings in both
> civil and criminal cases in adjudicating qualified immunity defense); Diaz, 618
> P.2d at 376 (Sutin, J., concurring)("The Penal Code definition governs in civil as
> well as criminal actions.  Under this statute, defendants are liable if two events
> occur: (1) defendants intentionally confined or restrained plaintiffs without their
> consent and (2) defendants knew that they had no lawful authority to do

> so.")(quotation omitted); <u>Scull v. New Mexico</u>, 236 F.3d 588, 599 (10th Cir.
> 2000)(when evaluating civil false imprisonment claim under New Mexico law,
> applying criminal standard that defendants "knew that they had no lawful
> authority to" intentionally confine or restrain the victim).

<u>Fuerschbach v. Sw. Airlines Co.</u>, 439 F.3d at 1208 n.9.  The Tenth Circuit applied the following

standard: "A defendant possessed of a good faith and reasonable belief in the lawfulness of the

action is not liable for false imprisonment or false arrest," explaining that "a good faith belief in

the lawfulness of the action ordinarily requires probable cause to arrest."  <u>Fuerschbach v. Sw.</u>

<u>Airlines Co.</u>, 439 F.3d at 1207-8 (citations omitted).  Even if a plaintiff shows that he was falsely

imprisoned, the analysis cannot end with the common law tort analysis.  "Rather, a plaintiff

states a claim for false imprisonment in violation of § 1983 by specifically alleging facts that

show a government official acted with deliberate or reckless intent to falsely imprison the

plaintiff."  <u>Romero v. Fay</u>, 45 F.3d 1472, 1480 (10th Cir. 1995).  "Section 1983 imposes liability

for violations of rights protected by the Constitution, not for violations of duties of care arising

out of tort law."  <u>Major v. Benton</u>, 647 F.2d 110, 113 (10th Cir. 1981).

> [U]nder state common law . . . the slightest interference with personal liberty is a
> false imprisonment.  It does not follow that all such invasions however trivial or
> frivolous serve to activate remedies under the due process clause of the
> Fourteenth Amendment as well as those parts of the Bill of Rights which are
> incorporated in and made a part of due process.

<u>Wells v. Ward</u>, 470 F.2d 1185, 1187 (10th Cir. 1972).

Chavez argues that he should have been released on February 8, 2011, when Mr. Pistone

sent information to the MDC that Chavez was arrested on an invalid warrant; he blames Rustin

for instituting the MDC policy that requires a subsequent court order before the MDC will

release a prisoner. Rustin argues that New Mexico law requires the policy he enacted. N.M.

Stat. Ann. § 33-3-12 states:

> A. Every public officer who has power to order the imprisonment of any person for violation of law shall, on making such order, transmit to the sheriff, jail administrator or independent contractor of his respective county a true copy of the order so that the person imprisoned may be considered under his custody until expiration of the commitment or until further steps, as provided by law, are taken to obtain the prisoner's liberty, of which he shall, in due time, notify the sheriff, jail administrator or independent contractor in writing.
>
> B. Any jailer who deliberately and knowingly releases a prisoner without an order of release as provided in this section, except upon expiration of the prisoner's term of commitment, is guilty of a misdemeanor and shall be removed from office.

N.M. Stat. Ann. § 33-3-12. "Once in custody, a prisoner may not be released until expiration of

his or her term of commitment or until an order of release is issued." N.M. Att'y Gen. Op. No.

94-08 at *2 n.1 (citing N.M. Stat. Ann. § 33-3-12(B)). Rustin argues that the MDC employees

acted in accordance with MDC policy by telling Mr. Pistone that the MDC would not release

Chavez until he submitted a court order setting the conditions of Chavez' release. The

Defendants contend, and the Court agrees, that the MDC policy draws on New Mexico law as

the basis for requiring a separate order of release. In Scull v. New Mexico, the Tenth Circuit

addressed N.M. Stat. Ann. § 33-3-12, noting that, "[u]nder New Mexico law, a prisoner may be

released upon the issuance of a court order[.]" 236 F.3d at 597. In that case, the plaintiff had an

order from Judge Nelson granting him a writ of habeas corpus from the detention center in Taos

County, but the Bernalillo County Detention Center refused to release him; the Tenth Circuit

said that, "[g]iven the terms of Judge Nelson's order, we fail to see how Mr. Reed had either a

constitutional or statutory right to be released from the BCDC." 236 F.3d at 597. The Tenth

Circuit rejected the plaintiff's argument that Judge Nelson's reasoning in the order gave him a constitutional right to be released from the BCDC, and likewise rejected the argument that the BCDC's "knowledge of the order should, at the very least, have prompted the BCDC Appellees to investigate the matter -- for example, by contacting Judge Nelson."  236 F.3d at 597. Although the Tenth Circuit did not "endorse the BCDC Appellees' failure to pursue the matter," the Tenth Circuit ultimately concluded that the "BCDC Appellees were not required by either the Constitution or statute to investigate independently Mr. Reed's claim that he should be released within this time frame."  236 F.3d at 598.

The parties disagree as to whether Scull v. New Mexico resolves the issues in this case; the Defendants argue that the case demonstrates that they did not need to independently investigate the validity of the bench warrant, even after receiving notice from Mr. Pistone that it was cancelled.  Chavez, on the other hand, argues that there are important differences between Scull v. New Mexico and this case; Reed was incarcerated based on a valid warrant, and the basis for his argument that he should be released was that Judge Nelson had granted a writ of habeas corpus in a different county.  Chavez was incarcerated based on a warrant that had already been cancelled, and so he argues that the Defendants had no lawful basis to continue detaining him.  The distinction -- whether there was an outstanding warrant justifying incarceration -- is an important one.  That distinction is the reason why the Court determined that Chavez' claims are appropriately couched under a false imprisonment theory rather than malicious prosecution, because the former involves incarceration based on legal process and the latter does not.  The question, however, is whether that distinction makes a constitutional difference when analyzing the Defendants' conduct in this case.  As noted earlier, a jailer is not

expected to "assume the mantle of a magistrate," but the jailer also cannot ignore an "objectively apparent lack of a basis for a detention."  Dry v. United States, 235 F.3d at 1259.  A cancelled warrant, standing alone, is not a proper basis for a detention, and Mr. Pistone attempted to alert the Defendants that Chavez' warrant had been cancelled.  Once a jailer has an "affirmative knowledge of the illegality of the arrest," he may be subject to liability for continuing to detain the prisoner, "[b]ut if the errors upon which liability is asserted take place beyond the scope of his responsibility, he cannot be found liable where he has acted reasonably and in good faith." Wood v. Worachek, 618 F.2d at 1231.  As the Supreme Court described in the context of the Fourteenth Amendment, the criminal justice system necessarily and appropriately divides responsibilities among different people:

> The Fourteenth Amendment does not protect against all deprivations of liberty.  It protects only against deprivations of liberty accomplished "without due process of law."  A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers -- all of whom may be potential defendants in a § 1983 action -- is entirely consistent with "due process of law." Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.  Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim.  The ultimate determination of such claims of innocence is placed in the hands of the judge and the jury.

Baker v. McCollan, 443 U.S. at145-46.  Here, the MDC employees who learned about Chavez' cancelled bench warrant did not act unreasonably by requiring an order of release from a judge, who could better determine why the bench warrant remained available to the APD at Chavez' arrest and whether any other basis for detaining Chavez existed.  The error in arresting Chavez occurred outside the MDC's control and responsibility, and it was not unreasonable for the MDC

employees, acting on MDC policy, to require another actor in the system -- a judge -- to determine if release truly was proper when Chavez was incarcerated based on a facially valid warrant. As in Scull v. New Mexico, the Court does not see how requiring a court order violates the Fourth Amendment. Further, a false imprisonment claim under the Fourth Amendment requires that the government official acted with deliberate or reckless intent to falsely imprison the plaintiff; waiting for verification from a judge that releasing Chavez was appropriate does not demonstrate the necessary intent to falsely imprison Chavez. The MDC policy of requiring a court order setting the conditions of release is a reasonable requirement; the Court would have some concern if jailers released prisoners based solely on letters that they received from defense counsel or people purporting to be defense counsel. Although Mr. Pistone also directed the MDC employees to the State Docket to confirm his assertions, the MDC initially incarcerated Chavez based on a facially valid warrant, and even after learning that the warrant was cancelled, the MDC employees would not know if there was another reason why the warrant remained available to the APD that did not appear on the public record.

The Court concludes that the MDC employees did not violate Chavez' Fourth Amendment[19] rights by detaining him an additional two days while they waited for a court order setting the conditions of Chavez' release. Because there is no constitutional violation, Chavez also cannot show that Rustin violated his constitutional rights by instituting and approving the MDC policy, which directed the MDC employees to act as they did. Rustin is entitled to

---

[19] The Court notes that, if Chavez intended to assert these claims under the Fourteenth Amendment right to due process rather than the Fourth Amendment right to be free from unreasonable seizure, the Court would reach the same conclusion to grant partial summary judgment on the federal claims; when an adequate state remedy exists, such as a state tort claim, the requirements of due process are satisfied. See Myers v. Koopman, 738 F.3d at 1192. New Mexico recognizes false arrest and false imprisonment, Romero v. Sanchez, 895 P.2d at 215; Chavez therefore has an adequate post-deprivation remedy under New Mexico law.

- 92 -

qualified immunity, because Chavez has not demonstrated that his constitutional rights were violated.

### C.    THE LAW WAS NOT CLEARLY ESTABLISHED IN 2011.

Although the Court concludes that neither Rustin nor any MDC employee violated Chavez' Fourth Amendment constitutional rights by incarcerating him pursuant to a facially valid warrant or by continuing to detain him after receiving notice that the warrant was invalid, the Court concludes that, even if a constitutional violation occurred, the law was not clearly established in 2011 so that a reasonable jailer in the shoes of an MDC employee or a reasonable detention center director in Rustin's shoes would have understood that he or she was violating that constitutional right.

To be clearly established, the right must be "so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't Of Corr., 429 F. App'x at 710 (quoting Zweibon v. Mitchell, 720 F.2d at 172-73).  The Court must ask "whether the law put officials on fair notice that the described conduct was unconstitutional."  Pierce v. Gilchrist, 359 F.3d at 1298.  Regarding the first potential constitutional violation -- that the MDC employees, and Rustin through his supervision and implementation of the MDC policies, violated Chavez' Fourth Amendment right to be free from an unreasonable seizure by incarcerating him based on a facially valid, but legally invalid, warrant -- the clearly established law weighs in support of the Defendants' conduct, because unless a jailer has a reason to doubt the basis for a prisoner's detention, he does not need to investigate into the probable cause of arrest.  See Dry v. United States, 235 F.3d at 1259 (stating that "absent any objectively apparent lack of a basis for a detention which should arouse

suspicion, a jailer cannot be expected to assume the mantle of a magistrate to determine the probable cause for an arrest").  Regarding the second potential constitutional violation -- that the MDC employees, and Rustin through his supervision and implementation of the MDC policies, violated Chavez' Fourth Amendment right to be free from an unreasonable seizure by continuing to incarcerate him after receiving notice that he was arrested on a cancelled bench warrant, and by failing to investigate this claim and release Chavez before a judge ordered conditions for release -- the Court concludes that a jailer in the MDC employees' position or a director in Rustin's position would not have been on fair notice that such conduct was unconstitutional.  In Scull v. New Mexico, the Tenth Circuit said that the Constitution does not require a jailer to independently investigate a prisoner's claims of innocence.  See 236 F.3d at 598.  When the detention center director and employees in that case were presented with a court order regarding the prisoner's release in a different county, they did not do anything to verify whether that release should apply in their county, and the prisoner remained in custody for thirty days.  See 236 F.3d at 597.  After reviewing the New Mexico statutes requiring a court order before a jail may release a prisoner, the Tenth Circuit stated: "Given the terms of Judge Nelson's order, we fail to see how Mr. Reed had either a constitutional or statutory right to be released from the BCDC."  236 F.3d at 597.  There are differences between the facts in Scull v. New Mexico and this case, but the message conveyed to jailers seems to be that they do not have an independent duty to investigate a prisoner's allegations that the prisoner should be released.  Instead, the Constitution permits the jailer to wait for a court order from a judge, as state law demands.  The Court has not identified a case from the Tenth Circuit or the Supreme Court that clearly indicates otherwise, such that a jailer or jail director would understand that this conduct violates the

Constitution.  Rustin is entitled to qualified immunity, because even if he, through implementing the MDC policies, violated Chavez' constitutional rights, the law was not clearly established in 2011 such that a government official in Rustin's shoes would have understood that the policies, when applied to a person in Chavez' situation, violated the Constitution.

### D.   THE COURT WILL DISMISS THE MUNICIPAL LIABILITY CLAIM, BECAUSE CHAVEZ HAS NOT DEMONSTRATED THAT AN OFFICER COMMITTED AN UNDERLYING CONSTITUTIONAL VIOLATION.

To establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  The Defendants argue that Chavez has failed to allege in the Complaint facts to support these elements.  See MSJ at 15.  The Complaint does not mention the municipal policy or custom, and thus, does not describe a causal link between the policy or custom and the injury alleged.  See Complaint at 1-3.  The Court could dismiss the municipal liability claims on this pleading ground, although it would be reluctant to do so if it believed that Chavez could amend his Complaint and survive summary judgment.  Chavez has not, however, demonstrated the first element of a municipal liability claim -- that an officer committed an underlying constitutional violation.   Without a constitutional violation, the municipal liability claim fails.  See Jiron v. City of Lakewood, 392 F.3d 410, 419 n.8 (10th Cir. 2004)(stating that, when the finding of qualified immunity for the officer is based on the conclusion that the officer did not commit a constitutional violation, a finding of qualified immunity precludes the imposition of municipal liability).  The Court, finding that Rustin did not

commit a constitutional violation and is entitled to qualified immunity, will dismiss with prejudice Chavez' municipal liability claim.

## II.    THE   COURT   WILL   DECLINE   TO   EXERCISE   SUPPLEMENTAL JURISDICTION OVER THE REMAINING STATE LAW CLAIMS IN THE CASE.

The Court's conclusion that partial summary judgment in the Defendants' favor is appropriate disposes of all federal claims in this case.  Given the Tenth Circuit's guidance that, "[w]hen all federal claims have been dismissed, the Court may, and usually should, decline to exercise jurisdiction over any remaining state claims," Smith v. City of Enid By and Through Enid City Comm'n, 145 F.3d at 1156, the Court concludes that remanding the remaining state-law claims is the appropriate resolution of the matter.  The Court will, therefore, deny the MSJ to the extent that it asks the Court to act upon the claims that arise exclusively under state law.

**IT IS ORDERED** that the Defendants' Motion for Summary Judgment, filed April 11, 2013 (Doc. 8), is granted in part and denied in part.  The federal claims are dismissed with prejudice.  The remaining case and claims are remanded to the Second Judicial District Court, County of Bernalillo, State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Scott A. Pistone
Michael E. Lash
Law Offices of Scott Pistone, Ltd. Co.
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Jeffrey L. Baker
Renni Zifferblatt
The Baker Law Firm
Albuquerque, New Mexico

*Attorneys for the Defendants*